[No. S005499. July 7, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
MARCELINO RAMOS, Defendant and Appellant.

**COUNSEL**

Michael Laurence, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Frederick R. Millar, Jr., and Robert M. Foster, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BROWN, J.**—Defendant Marcelino Ramos and his codefendant Ruben Gaitan (not a party to this appeal) were charged with two counts of robbery,

one count of murder, and one count of attempted murder in connection with a robbery and shooting incident at an Orange County fast-food establishment. A jury convicted both defendants on all counts, and found the murder and attempted murder to be of the first degree. As to defendant, the jury further found true the special circumstance allegation that the murder was committed while he was engaged in the commission of robbery. (Pen. Code, § 190.2, former subd. (a)(17)(i).) It found the special circumstance not true as to Gaitan. (See *People* v. *Ramos* (1982) 30 Cal.3d 553, 562 [180 Cal.Rptr. 266, 639 P.2d 908] (*Ramos I*).)

The jury returned a penalty phase verdict of death. On automatic appeal, this court reversed the sentence because the trial court had given the "Briggs Instruction," informing the jury life without possibility of parole could be commuted by the Governor. (*Ramos I, supra,* 30 Cal.3d at pp. 591-602.) The United States Supreme Court reversed that judgment, concluding the instruction did not violate the federal Constitution. (*California* v. *Ramos* (1983) 463 U.S. 992 [103 S.Ct. 3446, 77 L.Ed.2d 1171].) On remand, this court reversed the special circumstance finding and penalty judgment because the trial court failed to instruct the jury it must determine defendant intended to kill the victim, as then required under *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862]. (*People* v. *Ramos* (1984) 37 Cal.3d 136, 150 [207 Cal.Rptr. 800, 689 P.2d 430] (*Ramos II*).) We further held the Briggs Instruction violated the due process clause of the California Constitution. (*Id.* at pp. 150-159.)

The matter returned to the trial court for further proceedings on the special circumstance allegation and penalty. Relying on *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], the court indicated it would not instruct on intent to kill. Defendant waived jury and admitted the truth of the special circumstance allegation. However, he reserved the right to present evidence relating to his intent, which he did in conjunction with a new trial motion. A jury returned a second penalty verdict of death. The trial court denied the motion for a new trial and for modification of sentence. (Pen. Code, § 190.4, subd. (e).) This appeal is automatic. (Pen. Code, § 1239, subd. (b); further unspecified statutory references are to the Penal Code.) For the reasons that follow, we affirm the judgment.

## I. FACTS

### A. *Prosecution's Penalty Phase Evidence*

The prosecution introduced evidence of the circumstances of defendant's crimes substantially as it was presented at the guilt phase trial.

Late on the night of June 2, 1979, Katharyn Parrott and Kevin Pickrell were working at a Taco Bell restaurant in Santa Ana, California. They planned to close at 1 a.m. Just before closing, Gaitan entered the establishment and placed a large food order. While Parrott was preparing the order, defendant entered. Pickrell recognized defendant as a coworker employed at the Taco Bell as a janitor. Defendant asked to check his schedule, and Pickrell admitted him behind the front counter.

Approximately a minute later, defendant emerged from the back carrying a rifle partially covered with a jacket. Thinking it was a joke, Pickrell began laughing; but defendant informed him that he was not kidding. He told Gaitan to hop over the front counter and then directed both Pickrell and Parrott inside the restaurant's walk-in refrigerator. According to Pickrell defendant acted oddly, almost as though he did not recognize Pickrell and Parrott.

Defendant entered and left the refrigerator several times. He asked about the keys to the safe and repeatedly told Pickrell and Parrott to keep quiet. When defendant entered for the last time, he told the two employees to kneel on the floor and remove their hats. He had Parrott place a rag in her mouth.

Pickrell testified that the next thing he remembered was feeling Katharyn Parrott fall toward him. Almost simultaneously, he felt a sharp blow to the back of his head and also fell over; another blow followed. He never heard a gunshot or smelled smoke. He lay on the floor until he could hear no movement in the building. When he got up, he discovered Parrott's body next to him and called the police. Parrott was dead when the police arrived.

Pickrell was treated at a nearby hospital for lacerations on the back of his head. The treating physician also noted two smaller lacerations behind the right ear and a piece of tissue missing from the ear itself, which could have been caused by a glancing gunshot. The autopsy performed on the body of Katharyn Parrott indicated she had died of a gunshot wound to the head. The examination also disclosed two lacerations to the back of the head, inflicted at or near the time of death, most probably caused by a blow from a blunt, heavy object. At the retrial, the examining pathologist stated the object could have been the butt of a rifle.

Defendant and Gaitan were arrested the next day. Pursuant to a warrant, a search of their apartment yielded over $1,000, approximately the amount taken from the Taco Bell. Additional seized items included torn pieces of a diagram of the Taco Bell and pieces of a Mexican food order form. (See *Ramos I, supra,* 30 Cal.3d at pp. 563-564.)

B. *Defendant's Penalty Phase Evidence*

The defense presented a variety of witnesses. Some were called to impeach certain prosecution witnesses including David Lam, a jailhouse informant. Others gave evidence concerning defendant's childhood, learning difficulties, and other aspects of his background.

With respect to defendant's background, witnesses described his early life in San Antonio, Texas, where he was adopted at birth by Mario and Camilla Ybarra because his mother would not care for him; the Ybarras also adopted defendant's older half brother, but the two apparently were not close. The family lived in a lower income Hispanic neighborhood in which young boys were vulnerable to gang influence. Mario died when defendant was five years old. Camilla was deeply devoted to her religious activities in the Church of la Luz del Mundo and raised defendant very strictly. When defendant became a teenager, Camilla developed health complications from diabetes and died when he was 14. During her illness, defendant was very attentive and helped with chores and other household responsibilities. Following her death, he and his brother struggled to support themselves.

Numerous witnesses described defendant as religious, well behaved, protective of others, and helpful prior to Camilla's death. Thereafter, however, he ceased going to church regularly. He began to associate with Gaitan, with whom he drank alcohol and smoked marijuana; nevertheless, he had no previous contacts with the law. Gaitan's father was an abusive alcoholic. When Gaitan's mother died, defendant went with him to California. Mutual friends described Gaitan as more intelligent and a leader, defendant as a slow thinker and a follower. Defendant's low intelligence level, possibly the result of mild organic brain damage, was confirmed by psychological testing after his arrest. Other witnesses spoke of defendant's return to religion following his incarceration on death row, as well as his positive adjustment to prison life.

Defendant testified in his own behalf and recounted his childhood, his religious upbringing, and the deaths of his father and mother. After his mother died, he became less involved with his church and stopped attending school. He and his brother had severe financial problems, in part because their guardian aunt failed to provide for them. After he left school, defendant had a series of jobs to support himself, but was unable to advance because of his low intelligence. He then met Gaitan. The two joined the National Guard from which defendant was honorably discharged. They traveled to California because Gaitan had problems with his probation officer. After arriving, defendant had several jobs and stayed at various locations in Orange County.

Defendant stated he never considered robbing the Taco Bell until Gaitan raised the possibility the night of the crimes. He did not intend to kill any of the other employees, only knock them out. He had a bus ticket to Denver and was going to leave town. During the robbery, however, he became angry and shot the rifle. While in prison, he wrote a letter to the victim's mother expressing his remorse. He also formed a prayer group and studied for his high school equivalency certificate. He acknowledged some disciplinary problems in prison and jail, but offered explanations for his misconduct.

## C. *Prosecution's Rebuttal Evidence*

In rebuttal, the prosecution called Deputy Sheriff Cejka, the night patrol officer at the Orange County jail where defendant was housed before and during his penalty retrial. Cejka testified to an incident in which defendant used abusive language and made a possible threat after Cejka shined his flashlight in defendant's cell during an early morning body count.

## II. DISCUSSION

### A. *Application of People v. Anderson*

■ Defendant admitted the truth of the special circumstance allegation —that he committed the murder during the commission of a robbery (former § 190.2, subd. (a)(17)(i))—after the court announced it would not instruct on intent to kill. It rejected defendant's law of the case argument (see *Ramos II, supra*, 37 Cal.3d at p. 150) in light of the substantial change in controlling law effected by *People* v. *Anderson, supra*, 43 Cal.3d 1104. Defendant contends this ruling violated due process and the proscription against ex post facto laws because his case was pending on appeal when this court construed section 190.2, subdivision (b), to require such intent in *Carlos* v. *Superior Court, supra*, 35 Cal.3d at pages 153-154. In *People* v. *Garcia* (1984) 36 Cal.3d 539, 549 [205 Cal.Rptr. 265, 684 P.2d 826], we held *Carlos* "should apply retroactively to all cases not yet final." (Fn. omitted.) In *People* v. *Anderson, supra*, 43 Cal.3d at pages 1138-1147, we in part overruled *Carlos* and concluded no intent was required for actual killers. *Anderson* does not apply to crimes committed during the "window" period between the two cases. (*In re Baert* (1988) 205 Cal.App.3d 514, 517-522 [252 Cal.Rptr. 418].)

In *People* v. *Whitt* (1990) 51 Cal.3d 620, 637-638 [274 Cal.Rptr. 252, 798 P.2d 849], involving a similar chronology, we were unpersuaded "that to

apply *Anderson* . . . retroactively to [the defendant's] crimes violates federal due process because he lacked 'fair warning' that intent to kill was not a prerequisite to death eligibility. [Citation.] We rejected the same claim in *People* v. *Poggi* (1988) 45 Cal.3d 306, 326-327 . . . , on grounds that the statute itself [was] 'ambiguous' and provides ample 'pre-*Carlos* foreseeability of a holding that such intent is not required for the actual killer. [Citation.]' [Citation.]" As in *Whitt*, we see no reason to reconsider *People* v. *Poggi* (1988) 45 Cal.3d 306 [246 Cal.Rptr. 886, 753 P.2d 1082]. (*People* v. *Whitt*, *supra*, 51 Cal.3d at p. 638.) Furthermore, since *Carlos* was not the law when defendant committed his crime, application of *Anderson* raises no ex post facto concerns. (*People* v. *Kaurish* (1990) 52 Cal.3d 648, 697 [276 Cal.Rptr. 788, 802 P.2d 278]; see *Collins* v. *Youngblood* (1990) 497 U.S. 37, 43 [110 S.Ct. 2715, 2719-2720, 111 L.Ed.2d 30]; cf. *In re Baert*, *supra*, 205 Cal.App.3d at pp. 517-522 [ex post facto violation to apply *Anderson* to crimes committed during "window" period].)

In *Whitt*, we also rejected arguments that law of the case or equal protection mandates application of *Carlos* in these circumstances. "Obviously, *Anderson* is an intervening, controlling change in the law." (*People* v. *Whitt*, *supra*, 51 Cal.3d at p. 639.) Moreover, defendant "is in the same position as all appellants who personally committed felony murder before *Carlos* v. *Superior Court*, *supra*, 35 Cal.3d 131, including those whose trials were conducted while *Carlos* was the applicable law. [Citation.] The only difference in defendant's case is the fortuitous timing of his first appeal." (*People* v. *Whitt*, *supra*, 51 Cal.3d at p. 639; see also *id.* at p. 638, and cases cited therein.)

Defendant claims application of *Anderson* violates the Eighth Amendment in failing to narrow meaningfully the class of death-eligible defendants. In support, he cites *Enmund* v. *Florida* (1982) 458 U.S. 782, 787 [102 S.Ct. 3368, 3371, 73 L.Ed.2d 1140], for the proposition capital punishment is disproportionate for one who "does not himself kill, attempt to kill or intend that a killing take place . . . ." Therefore, he argues, the jury must expressly find such intent as a constitutional prerequisite. In *Tison* v. *Arizona* (1987) 481 U.S. 137, 150 [107 S.Ct. 1676, 1684, 95 L.Ed.2d 127], however, the Supreme Court "made clear that imposition of the death penalty upon 'actual killers,' like defendant, is not unconstitutional per se." (*People* v. *Whitt*, *supra*, 51 Cal.3d at p. 637.) Although he presented evidence he lacked the intent to kill, defendant does not dispute he personally killed the victim; nor does he contend the penalty jury failed to consider his individual circumstances. We thus find the trial court properly applied the law under *People* v. *Anderson*, *supra*, 43 Cal.3d 1104.

### B. *Jury Selection*

#### 1. *Motion to Quash the Jury Venire as Underrepresentative of Hispanics*

##### a. *Evidence Presented*

Prior to retrial, defendant moved to quash the jury venire available for his case on the ground it was underrepresentative of Hispanics.[1] After extensive discovery, defendant presented the following evidence at a lengthy hearing held between November 1986 and March 1987:

The Orange County Jury Commissioner compiles a computer-generated countywide master list of potential jurors to be used for trial in capital cases by randomly drawing names of registered voters and Department of Motor Vehicles licensees. The source lists are periodically updated; county officials prepare a new master list every four to eight months. From the master list, a computer program randomly selects individuals for jury service. Unlike the two-step process used in most counties, these individuals are simultaneously summoned and sent a packet of materials for qualifying as jurors.

The responses to the summonses are reviewed by the jury commissioner's staff to determine qualifications as well as to evaluate requests for exemptions, excusals, and deferrals. All such determinations are based on written standards and policies, which are applied without regard to race or national origin. Approximately one-fifth of those summoned are called to perform jury duty. Those who report to the courthouse and are available for jury selection are paid for their service, and their names appear on the jury appropriations list.

The defense presented the testimony of various demographic and statistical experts including principally Dr. Edgar Butler, a professor of sociology who has previously testified on jury selection matters. (See *People* v. *Breaux, supra,* 1 Cal.4th at pp. 295-296; *People* v. *Harris* (1984) 36 Cal.3d 36, 46-47 [201 Cal.Rptr. 782, 679 P.2d 433], disapproved on other grounds in *People* v. *Bell, supra,* 49 Cal.3d at p. 526, fn. 12.) For the period March 1985 through February 1986, Dr. Butler gave several estimates of the Hispanic population of Orange County, the number of jury-eligible Hispanics in the county, the number of Hispanics summoned for jury service, and

---

[1]As in previous cases, we utilize the following terminology in discussing various phases of the jury selection process: A "venire" is the group of prospective jurors summoned from a larger list of eligible jurors. A "panel" is the group of jurors from the venire assigned to a court for selection of the trial jury. (See *People* v. *Breaux* (1991) 1 Cal.4th 281, 296, fn. 2 [3 Cal.Rptr.2d 81, 821 P.2d 585]; *People* v. *Bell* (1989) 49 Cal.3d 502, 520, fn. 3 [262 Cal.Rptr. 1, 778 P.2d 129].)

the number who appeared at the courthouse available to serve. These estimates varied depending upon the source of the raw data and whether Dr. Butler was referring to individuals with Spanish surnames or those who had self-identified as being of Hispanic descent. The prosecution submitted the testimony of Dr. Nancy Minter, who worked on population studies and statistical analyses for various governmental entities.

Following the hearing and submission of points and authorities, the trial court issued a statement of decision. Based on Dr. Minter's testimony, the court found that for the year 1986 the Hispanic jury-eligible population in Orange County was between 8.6 and 9.9 percent. "In this context the court uses the term Hispanic to refer to those in the population who identify themselves as Spanish in origin or background; this population segment is a cognizable group." Utilizing the master list and jury appropriations list, defendant's experts determined that for the period March 1985 through February of 1986, 8,585 individuals were summoned for jury duty and 1,784 were authorized to be paid for service during that time. Of the latter group, 9.76 percent had Spanish surnames, according to a list of surnames prepared by the United States Census Bureau.

To approximate the number who would identify themselves as Spanish in origin, the court used a multiplier of 1.15 resulting in 11.22 percent Hispanics who performed jury duty during the relevant time. The court further found "[e]vidence failed to demonstrate that the Jury Commissioner of Orange County and his staff do not fairly and evenhandly [sic] apply the criteria for qualification, exemption, exclusion, and deferment of jury service" or that the jury system did not operate "without regard to race, ethnic i[]dentification, or national origin."

The defense based its percentage estimates on a population survey by Dr. Butler. The court, however, deemed the survey fatally flawed in at least two respects: it excluded some portions of Orange County while including parts of Los Angeles and San Bernardino Counties; it also was "unreliable and inaccurate" because it did not meet "adequate standards of preparation and presentation." With respect to Dr. Butler's study of the 1,784 individuals on the appropriations list from which he concluded 8.8 percent of those who appeared for jury service identified themselves as Hispanic in origin, the court found the analysis "not credible" as a result of ambiguities contained in questionnaires used for the study. (Cf. *People* v. *Morales* (1989) 48 Cal.3d 527, 548-549 [257 Cal.Rptr. 64, 770 P.2d 244] [no prima facie showing of systematic exclusion because defendant's statistics based on only two consecutive sample jury panels].)

In light of these findings, the trial court concluded defendant had failed to state a prima facie violation of his constitutional rights to a jury drawn from

a cross-section of the population; the representation of Hispanics in the jury venires was fair and reasonable; there was no underrepresentation due to any systematic exclusion of Hispanics in the jury selection process. The court also rejected defendant's claim of an equal protection violation. It thus denied the motion to quash the venire from which defendant's jury would be chosen. On the same basis, it also denied a motion to quash the jury panels immediately prior to jury selection.

b. *Discussion*

■ " 'In California, the right to trial by jury drawn from a representative cross-section of the community is guaranteed equally and independently by the Sixth Amendment to the federal Constitution [citation] and by article I, section 16 of the California Constitution. [Citation.]' [Citation.] 'In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.' [Citations.] If a defendant demonstrates a prima facie case of systematic underrepresentation under this tripartite test, the burden shifts 'to the state to come forward with either a more precise statistical showing that no constitutionally significant disparity existed or that there was a compelling justification for the procedure which results in the disparity in the jury pool.' [Citation.]" (*People* v. *Sanders* (1990) 51 Cal.3d 471, 491 [273 Cal.Rptr. 537, 797 P.2d 561], quoting *Duren* v. *Missouri* (1979) 439 U.S. 357, 364 [99 S.Ct. 664, 668, 58 L.Ed.2d 579], for the tripartite test.)

Resolution of defendant's claim on appeal presents a mixed question: Application of the constitutional standard is a question of law on which this court rules de novo. With respect to the factual predicates, however, we defer to the trial court's findings to the extent they are supported by substantial evidence. (See *People* v. *Breaux, supra,* 1 Cal.4th at p. 297.) ■ Reviewing the record in light of these governing principles, we conclude defendant failed to satisfy the tripartite test articulated in *Duren* v. *Missouri, supra,* 439 U.S. 357.

The first element of the test is clearly satisfied. Whether characterized on the basis of Spanish surname or self-identification, Hispanics are a cognizable population within the community for purposes of representative cross-section analysis. (See *People* v. *Breaux, supra,* 1 Cal.4th at p. 298; *People* v. *Sanders, supra,* 51 Cal.3d at p. 491; *People* v. *Trevino* (1985) 39 Cal.3d 667,

683 [217 Cal.Rptr. 652, 704 P.2d 719], disapproved on other grounds in *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1221 [255 Cal.Rptr. 569, 767 P.2d 1047]; *People* v. *Harris, supra,* 36 Cal.3d at p. 51 (plur. opn. of Broussard, J.).)

The second element—challenging the fairness of group representation— requires a constitutionally significant difference between the number of members of the cognizable group appearing for jury duty and the number in the relevant community. In attacking the trial court's findings, defendant cites evidence of both absolute and comparative disparity between the percentage of jury-eligible Hispanics and those rendering jury service.[2] (See *People* v. *Sanders, supra,* 51 Cal.3d at p. 492, fn. 5; *People* v. *Bell, supra,* 49 Cal.3d at p. 527, fn. 14.) "We have previously noted that 'the [United States] Supreme Court has not yet spoken definitively on either the means by which disparity may be measured or the constitutional limit of permissible dispar- ity.' [Citation.]" (*People* v. *Sanders, supra,* 51 Cal.3d at p. 492.) This court as well has "in the past declined to adopt any one statistical methodology to the exclusion of others. [Citation.]" (*People* v. *Bell, supra,* 49 Cal.3d at pp. 527-528, fn. 14.) Because substantial evidence supports the trial court's finding of no disparity, we need not do so here either.

Relying on the testimony of Dr. Minter, the court determined the number of jury-eligible Hispanics as between 8.6 and 9.9 percent. In making her calculations, Dr. Minter utilized a sampling of the 1980 census data for persons 18 years or older, which she subjected to various adjustments for demographic changes through 1986 and overstating of citizenship by His- panics. She also explained how she derived from census data the 1.15 conversion ratio between persons with Spanish surnames and those who self-identify for Spanish origin or Hispanic descent. Applying this ratio to the number of Spanish-surnamed individuals summoned for jury duty from the countywide master list for the period March 1985 to February 1986, the

---

[2]Defendant's argument rests in part on data derived from a 1985 census report and the 1990 census, which he requests this court judicially notice. (Evid. Code, § 452, subd. (h); see, e.g., *People* v. *Howard* (1992) 1 Cal.4th 1132, 1160, fn. 6 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) We deny the request principally because the data were not presented below (see *People* v. *Superior Court (Lavi)* (1993) 4 Cal.4th 1164, 1173, fn. 5 [17 Cal.Rptr.2d 815, 847 P.2d 1031]); and they cannot be readily utilized either in evaluating the lower court's ruling or determining the broader constitutional question presented. It is unclear whether the data identify the total Hispanic population or the total adult, and presumptively jury-eligible, population on which the trial court based its findings. (Cf. *People* v. *Bell, supra,* 49 Cal.3d at p. 526, fn. 12.) If the former, the record contains no simple formula for converting it to the standard used by the court. Moreover, based on a study by Jeffrey Passel of the Census Bureau, Dr. Minter testified to the phenomenon of substantial overstating of citizenship—a critical qualification for jury duty—by persons from Mexico (68 percent) and others of Hispanic descent (35 percent).

court concluded this group totaled 11.22 percent, fully consonant with the percentage of Hispanics in the jury-eligible population.

Contrary to defendant's argument, this evidence is no less substantial because the trial court formulated its ruling based on the prosecution's proposed findings of fact. The court issued its statement of decision two weeks after the district attorney filed his closing brief and several days after defendant filed a response, following many months of testimony for which daily transcripts were available and cited by the parties. We have no reason to conclude it did not give careful consideration to the evidence and arguments of both sides in making its decision.

Moreover, even assuming Dr. Butler's population figures were credible and reliable, they fail to demonstrate a constitutionally significant disparity. His testimony established a range of absolute disparity between 2.7 and 4.3 percent and of comparative disparity between 23.5 and 37.4 percent. These percentages are generally within the tolerance accepted by federal reviewing courts. (See, e.g., *United States* v. *Pepe* (11th Cir. 1984) 747 F.2d 632, 649 [7.6 percent absolute disparity insufficient]; *United States* ex rel. *Barksdale* v. *Blackburn* (5th Cir. 1981) 639 F.2d 1115, 1126-1127 [absolute disparity ranging from 4.5 to 11.5 percent insufficient]; *United States* v. *Maskeny* (5th Cir. 1980) 609 F.2d 183, 190 [less than 10 percent absolute disparity insufficient].) They are also well below the 10 percent absolute disparity found inadequate by the United States Supreme Court in *Swain* v. *Alabama* (1965) 380 U.S. 202, 208-209 [85 S.Ct. 824, 829-830, 13 L.Ed.2d 759], overruled on other grounds in *Batson* v. *Kentucky* (1986) 476 U.S. 79, 100, footnote 25 [106 S.Ct. 1712, 1725, 90 L.Ed.2d 69]. (See also *People* v. *Bell*, *supra*, 49 Cal.3d at p. 528, fn. 15 ["far from clear" 5 percent absolute disparity (50 percent comparative disparity) sufficient; no jurisdiction has so held].)

We also find substantial evidence supporting the trial court with respect to the third element—underrepresentation due to systematic exclusion in the jury selection process. The jury commissioner testified the master list is compiled by merging randomly selected names of registered voters and motor vehicle licensees, both of which lists are neutral regarding ethnicity and national origin. (Cf. *People* v. *Sanders*, *supra*, 51 Cal.3d at pp. 494-496 [sole reliance on voter registration list constitutionally permissible].) The criteria for jury disqualification and for granting exemptions, excusals, and deferments disregard such considerations as well. (See Code Civ. Proc., §§ 203, 204; Cal. Standards Jud. Admin., § 4.5.) Nor did defendant present any evidence the jury commissioner and his staff fail to apply them even-handedly based on written policies guiding their implementation.

The only suggestion of impermissible exclusion related to the "load card" feature by which a computer program randomly selects names when merging the two source lists and to an unexplained doubling in the percentage of Hispanics on the master list after November 1985. One of defendant's experts testified numbers on the load card determined how many names the computer drew from each source list and, if intentionally altered, could impair the random selection function. However, defendant presented no evidence of such alteration. Errant speculation of improper manipulation does not meet a defendant's burden under the third prong of *Duren*. (See *People* v. *Breaux*, *supra*, 1 Cal.4th at pp. 298-299.) As for the anomalous increase in the number of Hispanics on the master list, the record established it resulted from a change in the programming to achieve a proper ratio of names drawn from each source list. Defendant submitted no proof the selection process failed to remain random or that it resulted in any possible disparity. (See *People* v. *Bell*, *supra*, 49 Cal.3d at pp. 529-530.) In any event, it clearly did not systematically *exclude* Hispanics. (*Ibid.*)

In light of the foregoing, we agree with the trial court that defendant failed to demonstrate a prima facie violation of his right to a jury drawn from a representative cross-section of the community. Since we find no constitutionally significant disparity between the number of jury-eligible Hispanics and the number of Hispanics reporting for jury service, defendant's equal protection claim must fail. The trial court also properly denied defendant's motion to quash his particular jury panels in light of the earlier factual and legal findings. For the reasons previously discussed, we find no abuse of the court's discretion in refusing to reopen the matter without a substantial showing of changed circumstances.

### 2. *Restriction of Defense Counsel's Voir Dire for Bias*

Relying principally on *People* v. *Williams* (1981) 29 Cal.3d 392 [174 Cal.Rptr. 317, 628 P.2d 869] and *Morgan* v. *Illinois* (1992) 504 U.S. 719 [112 S.Ct. 2222, 119 L.Ed.2d 492], defendant contends the trial court unduly and improperly restricted voir dire in a manner that precluded him from discovering prospective jurors' attitudes toward the death penalty and mitigation. We reject this claim for several reasons. First, of the 12 prospective jurors defendant allegedly had insufficient opportunity to voir dire, none served on his jury. In this context, his constitutional claims "must focus . . . on the jurors who ultimately sat. None of those 12 jurors, however, was challenged for cause . . . ." (*Ross* v. *Oklahoma* (1988) 487 U.S. 81, 86 [108 S.Ct. 2273, 2277, 101 L.Ed.2d 80]; *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1086-1087 [259 Cal.Rptr. 630, 774 P.2d 659].)

Second, assuming the challenged restrictions extended to those prospective jurors who eventually served, our analysis in *People* v. *Williams*, *supra*,

29 Cal.3d 392, expressly left "intact the considerable discretion of the trial court to contain voir dire within reasonable limits. [Citations.]" (*People* v. *Williams, supra,* 29 Cal.3d at p. 408; see *People* v. *Wash* (1993) 6 Cal.4th 215, 253 [24 Cal.Rptr.2d 421, 861 P.2d 1107].) The court's restriction on questions regarding, for example, a prospective juror's birth date, religion and religious service attendance, or voting on the retention of Chief Justice Rose Bird, as well as other proposed areas of inquiry, came well within that broad latitude. (See *People* v. *Williams, supra,* 29 Cal.3d at p. 408.) We have also approved appropriate limitation on death-qualification voir dire under *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [88 S.Ct. 1770, 20 L.Ed.2d 776] and *Wainwright* v. *Witt* (1985) 469 U.S. 412 [105 S.Ct. 844, 83 L.Ed.2d 841]. (See, e.g., *People* v. *Lucas* (1995) 12 Cal.4th 415, 479 [48 Cal.Rptr.2d 525, 907 P.2d 373]; *People* v. *Tuilaepa* (1992) 4 Cal.4th 569, 586 [15 Cal.Rptr.2d 382, 842 P.2d 1142].) The court did not abuse its discretion under the principles and standards articulated in those decisions.

Finally, as to those prospective jurors who ultimately heard the case, defendant does not explain what additional inquiry was necessary for an intelligent exercise of peremptory challenges in light of their responses to questions the court did permit. He thus has failed to demonstrate any prejudice. (Cf. *People* v. *Williams, supra,* 29 Cal.3d at pp. 410-411.)

### 3. *Prosecutor's Voir Dire*

Defendant contends the trial court improperly permitted the prosecutor to commit prospective jurors to prejudging the evidence during voir dire. As before, however, we need not address the merits of defendant's claim because none of the prospective jurors sat on his jury. (Cf. *People* v. *Bittaker, supra,* 48 Cal.3d at pp. 1086-1087; *People* v. *Coleman* (1988) 46 Cal.3d 749, 770-771 [251 Cal.Rptr. 83, 759 P.2d 1260].) Moreover, the questions arose during the individual phase of voir dire; therefore, none of the seated jurors could have been exposed to improper influence. (See *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 74-81 [168 Cal.Rptr. 128, 616 P.2d 1301].)

### 4. *Denial of Defendant's Challenges for Cause*

■ Defendant moved to exclude several prospective jurors for cause and the trial court denied each such challenge. The defense had exercised only 18 of its 26 peremptory challenges when it indicated no further objection to the jury as constituted. At a minimum, " 'exhaustion of peremptory challenges is a "condition precedent" to an appeal based on the composition of the jury. [Citation.]' " (*People* v. *Coleman, supra,* 46 Cal.3d at p. 770.) "California

courts hold that the defendant must exercise his peremptory challenges to remove prospective jurors who should have been excluded for cause, and that to complain on appeal of the composition of the jury, the defendant must have exhausted those challenges. [Citation.]" (*Ibid.*; *People* v. *Raley* (1992) 2 Cal.4th 870, 904-905 [8 Cal.Rptr.2d 678, 830 P.2d 712].) Defendant did not do so; he may not now claim error. More importantly, none of the prospective jurors sat on the ultimate jury. (*Ross* v. *Oklahoma, supra,* 487 U.S. at p. 86 [108 S.Ct. at p. 2277].) "Because there was no possible prejudice to defendant in such circumstances, no reversible error occurred." (*People* v. *Coleman, supra,* 46 Cal.3d at p. 771.)

Defendant argues he should not be bound by the exhaustion requirement because we formulated this "major modification" in the law subsequent to his trial. To the contrary, as noted in *People* v. *Coleman, supra,* 46 Cal.3d at page 770, the requirement " 'has long been the rule in California . . . .' " (Quoting *Kimbley* v. *Kaiser Foundation Hospitals* (1985) 164 Cal.App.3d 1166, 1169 [211 Cal.Rptr. 148].)

### 5. *Denial of Additional Peremptory Challenge to Alternate Juror*

■ Defendant predicates his final claim of jury selection error on the following facts: The trial court determined to seat four alternate jurors and allowed each side that number of peremptory challenges. (§ 1089.) Defendant exercised all four challenges, including two of them to excuse prospective alternate jurors the trial court refused to exclude for cause. During the course of the trial, the court excused a seated juror and replaced him with alternate Betty Dahlin.

Defendant now contends "Dahlin's unique circumstances prevented her from being impartial"; therefore, the court should have allowed him an additional peremptory challenge because it erroneously denied his two for-cause challenges. On voir dire, Dahlin had disclosed she and her husband owned a pharmacy and had been the victims of several armed robberies over a period of 15 to 20 years. During the most recent, her husband had been forced to get on his knees and beg for his life. Nevertheless, throughout questioning Dahlin consistently affirmed these experiences would not influence her judgment and she would keep an open mind despite the factual similarity between this case and her husband's latest robbery.

Although he did not move to exclude Dahlin for cause, defendant now contends she must have been unduly biased because of her experiences, thus denying his right to an impartial jury. (See, e.g., *Ross* v. *Oklahoma, supra,* 487 U.S. at p. 85 [108 S.Ct. at pp. 2276-2277].) On this basis, he reasons the

trial court should have allowed him an additional peremptory challenge to excuse her. Defendant has failed to preserve the issue for two reasons: First, defense counsel made no such request "after exercise of all his allotted challenges to alternates, either after their exercise or at the point when [Dahlin] replaced a juror who unexpectedly had to be excused. [Citation.]" (*People* v. *Coleman, supra,* 46 Cal.3d at p. 771, fn. 15; see also *People* v. *Bittaker, supra,* 48 Cal.3d at p. 1088.) Plainly, if a defendant desires the trial court to fashion an appropriate remedy under these circumstances, the request must be timely to afford the opportunity to rule when the ruling will be meaningful. (Cf. *People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468], disapproved on other grounds in *People* v. *Hall* (1986) 41 Cal.3d 826, 834, fn. 3 [226 Cal.Rptr. 112, 718 P.2d 99].) Second, although he eventually exercised all four peremptory challenges, counsel had previously accepted the prospective alternate jurors, including Dahlin, with two remaining. (Cf. *People* v. *Coleman, supra,* 46 Cal.3d at p. 770.)

In his supplemental briefing, defendant argues the court "should have dismissed" Dahlin in light of her background. He cites no authority for the implicit proposition that the court had a sua sponte duty to excuse a prospective juror who gave repeated assurances she could be fair. Although the " 'obligation to impanel an impartial jury lies in the first instance with the trial judge,' " the defendant must nevertheless comply with procedural prerequisites to appeal. (*People* v. *Avena* (1996) 13 Cal.4th 394, 413 [53 Cal.Rptr.2d 301, 916 P.2d 1000].) Absent a challenge for cause, the issue is not preserved.

## C. *Denial of Suppression Motion*

 Following defendant's arrest, the police executed a search warrant and seized numerous items from Gaitan's apartment. Prior to the guilt phase trial, he moved to suppress this evidence pursuant to section 1538.5; the trial court denied the motion. In *Ramos I,* this court rejected defendant's claim of error, finding the police properly detained Gaitan; any failure to comply with knock-notice requirements (§ 844) did not prejudice defendant; failure to secure an arrest warrant for defendant (see *People* v. *Ramey* (1976) 16 Cal.3d 263 [127 Cal.Rptr. 629, 545 P.2d 1333]) did not taint the subsequently obtained search warrant; any overbreadth in the description of items to be seized did not prejudice defendant; and the police properly seized items not within the scope of the search warrant given the demonstrated nexus between them and the crime under investigation. (*Ramos I, supra,* 30 Cal.3d at pp. 566-574.)

At the beginning of the penalty phase retrial, defendant again moved to suppress evidence pursuant to section 1538.5. As to all items except defendant's diary, the trial court denied the request based on the law of the case

doctrine. As to the diary, the court concluded section 1538.5, subdivision (h), precluded relitigation of the motion to suppress. Defendant challenges both these determinations in light of this court's opinion in *People* v. *Frank* (1985) 38 Cal.3d 711, 722-730 [214 Cal.Rptr. 801, 700 P.2d 415], which he contends constituted an intervening change in the law.

■ " 'The doctrine of the law of the case is this: That where, upon an appeal, the supreme court, in deciding the appeal, states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal, and, as here assumed, in any subsequent suit for the same cause of action, and this although in its subsequent consideration this court may be clearly of the opinion that the former decision is erroneous in that particular.' " (*People* v. *Shuey* (1975) 13 Cal.3d 835, 841 [120 Cal.Rptr. 83, 533 P.2d 211], quoting *Tally* v. *Ganahl* (1907) 151 Cal. 418, 421 [90 P. 1049]; *People* v. *Stanley* (1995) 10 Cal.4th 764, 786-787 [42 Cal.Rptr.2d 543, 897 P.2d 481].) "Application of the rule is now subject to the qualifications that 'the point of law involved must have been necessary to the prior decision, that the matter must have been actually presented and determined by the court, and that application of the doctrine will not result in an unjust decision.' [Citations.]" (*People* v. *Shuey, supra,* 13 Cal.3d at p. 842.) An "unjust decision" may result when "the controlling rules of law have been altered or clarified by a decision intervening between the first and second determinations of the appellate courts. [Citations.]" (*DiGenova* v. *State Board of Education* (1962) 57 Cal.2d 167, 179-180 [18 Cal.Rptr. 369, 367 P.2d 865]; *People* v. *Stanley, supra,* 10 Cal.4th at p. 787.)

■ The trial court properly applied these principles. The parties agree that our decision in *Ramos I, supra,* 30 Cal.3d 553, expressly upheld the admissibility of all seized evidence currently challenged except defendant's diary, which we then understood had not been put into evidence. (See *id.* at p. 573, fn. 6.) "[T]hose items were either validly seized pursuant to the warrant or were reasonably believed to have some connection to the crime being investigated." (*Id.* at p. 574.)

Although we acknowledged some of defendant's arguments had "technical merit" (*Ramos I, supra,* 30 Cal.3d at p. 569), any errors did not compromise the constitutionality of the seizure. For example, although defendant was "technically correct" that "the police officers did not literally comply with section 844's requirement that they announce their purpose" (*id.* at p. 570), "such noncompliance did not taint the search warrant and would not necessitate the suppression of any subsequently seized evidence. [Citation.]"

*(Id.* at p. 571.) Similarly, we assumed his warrantless arrest violated *People v. Ramey, supra,* 16 Cal.3d 263. *(Ramos I, supra,* 30 Cal.3d at p. 571.) Nevertheless, he was "still unable to demonstrate how the illegal arrest in any way facilitated the obtaining of the warrant and subsequent seizure of evidence." *(Ibid.)*

*People* v. *Frank, supra,* 38 Cal.3d 711, was not an intervening change that provided a basis for disregarding the law of the case. (Cf. *People* v. *Stanley, supra,* 10 Cal.4th at p. 790 [intervening change did not obviate application of law of the case doctrine because "in search and seizure cases a decision that represents a clear break with the past generally should not be given retroactive effect"].) That decision was a fact-specific application of extant principles governing the permissible scope of search warrants as well as the requirement of probable cause. *(People* v. *Frank, supra,* 38 Cal.3d at pp. 724-729.) In support of our conclusions, we cited not only the operative constitutional language but established judicial authority dating at least to 1961, and noted the "same rule has been followed in our Courts of Appeal." *(Id.* at p. 725; cf. *People* v. *Holmsen* (1985) 173 Cal.App.3d 1045 [219 Cal.Rptr. 598].)

Nor does *People* v. *Memro* (1995) 11 Cal.4th 786 [47 Cal.Rptr.2d 219, 905 P.2d 1305], warrant a different result. In *Memro,* we originally reversed the judgment of conviction and death penalty because the trial court erred in summarily denying the defendant's discovery motion. *(People* v. *Memro* (1985) 38 Cal.3d 658, 705 [214 Cal.Rptr. 832, 700 P.2d 446].) At that time we "left intact the ruling from the prior trial" and did not address the merits of the defendant's suppression motion. *(People* v. *Memro, supra,* 11 Cal.4th at p. 838.) Since there was thus no law of the case to invoke in the second appeal, we had no occasion to address its applicability.

In arguing the doctrine should not apply, defendant also cites *People* v. *Mattson* (1990) 50 Cal.3d 826, 849 [268 Cal.Rptr. 802, 789 P.2d 983], which held " '[t]he granting of a new trial places the parties in the same position as if no trial had been had. . . .' [Citation.]" Assuming without deciding this rule applies to the grant of a penalty phase retrial rather than to an unqualified reversal of the entire underlying judgment in a capital case (see generally, 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 625, p. 606 et seq.), it obtains only "[a]bsent a statutory provision precluding relitigation . . . ." *(People* v. *Mattson, supra,* 50 Cal.3d at p. 849.) Section 1538.5, subdivision (h), constitutes just such a preclusion and controls our decision here.

Section 1538.5, subdivision (h), provides: "If, prior to the trial of a felony or misdemeanor, opportunity for this motion did not exist or the defendant

was not aware of the grounds for the motion, the defendant shall have the right to make this motion during the course of trial in the municipal, justice, or superior court." We have construed the statute to deprive the court of jurisdiction to entertain a renewed suppression motion at trial except as statutorily provided. (*People* v. *Superior Court (Edmonds)* (1971) 4 Cal.3d 605, 611 [94 Cal.Rptr. 250, 483 P.2d 1202]; see *People* v. *Robbins* (1980) 103 Cal.App.3d 34, 41 [162 Cal.Rptr. 780], revd. on other grounds *sub nom. Robbins* v. *California* (1981) 453 U.S. 420 [101 S.Ct. 2841, 69 L.Ed.2d 744].) Defendant contends *People* v. *Frank, supra,* 38 Cal.3d 711, set forth a new ground for challenging the search warrant of which he was not aware at the time of his original motion. As we have explained, our decision in *Frank* simply refined established principles; it did not create new law. (See *People* v. *Williams* (1979) 93 Cal.App.3d 40, 59 [155 Cal.Rptr. 414]; *Cornelius* v. *Superior Court* (1972) 25 Cal.App.3d 581, 585 [102 Cal.Rptr. 59].) Accordingly, on the basis of section 1538.5, subdivision (h), the trial court properly refused to entertain defendant's motion to suppress as to all seized evidence admitted at retrial including the diary.

*People* v. *Superior Court (Corona)* (1981) 30 Cal.3d 193, 200 [178 Cal.Rptr. 334, 636 P.2d 23], is not to the contrary. In that case, the appellate court reversed the defendant's conviction based on a finding of ineffective assistance of counsel due to conflict of interest. (*People* v. *Corona* (1978) 80 Cal.App.3d 684, 720 [145 Cal.Rptr. 894].) The particular conflict "necessarily involved denial of the right to effective representation in all of the original proceedings, not just the trial itself," and therefore warranted renewal of the section 1538.5 motion. (*People* v. *Superior Court (Corona), supra,* 30 Cal.3d at p. 200.) No comparable circumstance arises here.

D. *Jailhouse Informant's Testimony*

 At the original trial, the prosecution presented evidence from David Lam, "who allegedly overheard portions of some remarks made by [defendant] while both men were occupying a holding cell at the county courthouse. Lam testified that he heard [defendant] admit shooting the victims and say that he enjoyed hearing them beg for their lives." (*Ramos I, supra,* 30 Cal.3d at p. 564.) Prior to retrial, Lam died; the prosecution offered his previous testimony, which was read in question-and-answer form by the prosecutor and an investigator from the district attorney's office. The defense impeached Lam with prior incidents of his antipathy toward Hispanics and opinions as to his lack of honesty. The court, however, excluded other impeachment evidence and denied certain evidentiary objections as well as a motion to strike the entire testimony as unreliable.

Defendant raises numerous claims on appeal relating to Lam's testimony. He first contends the evidence was not relevant to any statutory factor in

aggravation under section 190.3. (*People* v. *Stanley, supra,* 10 Cal.4th at p. 823; *People* v. *Boyd* (1985) 38 Cal.3d 762, 772-776 [215 Cal.Rptr. 1, 700 P.2d 782].) At trial, the prosecutor argued its relevance "to show intentional, voluntary, nonduress type killing" and noted defendant's state of mind at the time of the killing affected the question of remorse. ■ "[F]actor (a) of section 190.3 allows the sentencer to evaluate *all aggravating and mitigating aspects* of the *capital crime itself.* . . . The defendant's overt indifference or callousness toward his misdeed bears significantly on the moral decision whether a greater punishment, rather than a lesser, should be imposed. [Citation.]" (*People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1232 [275 Cal.Rptr. 729, 800 P.2d 1159]; *People* v. *Breaux, supra,* 1 Cal.4th at p. 313.) The jury may also consider lack of remorse when presented in the context of the "defendant's callous behavior after the killings . . . ." (*People* v. *Crittenden* (1994) 9 Cal.4th 83, 147 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People* v. *Clark* (1993) 5 Cal.4th 950, 1031 [22 Cal.Rptr.2d 689, 857 P.2d 1099].) ■ Lam testified that defendant "was saying to the other guy . . . how much of a trip it was, how the people were begging for their lives before they shot them." As the prosecutor later argued, in light of Pickrell's testimony he and Parrott pleaded for their lives, this evidence reflected directly on defendant's state of mind contemporaneous with the murder. It was thus relevant under section 190.3, factor (a) as bearing on the circumstances of the crime.

Defendant next contends the trial court should have excluded the evidence as inherently unreliable because Lam's testimony was inconsistent with defendant's and Lam was a jailhouse "snitch"; he also claims a violation of his rights under the confrontation clause. The admission of hearsay evidence such as former testimony does not violate the Sixth Amendment right of confrontation. (*Pointer* v. *Texas* (1965) 380 U.S. 400, 407 [85 S.Ct. 1065, 1069-1070, 13 L.Ed.2d 923]; see also *California* v. *Green* (1970) 399 U.S. 149, 159 [90 S.Ct. 1930, 1935-1936, 26 L.Ed.2d 489].) "[A] major reason underlying the constitutional confrontation rule is to give a defendant charged with crime an opportunity to cross-examine the witnesses against him. [Citations.]" (*Pointer* v. *Texas, supra,* 380 U.S. at pp. 406-407 [85 S.Ct. at p. 1069].) When he originally testified, Lam was subjected to defense questioning, the primary purpose of which was to test credibility including any motive to fabricate. (See *People* v. *Williams* (1968) 265 Cal.App.2d 888, 894-896 [71 Cal.Rptr. 773].) Submission of his prior testimony also satisfied the other foundational requirements of Evidence Code section 1291; thus, its admission was proper (*People* v. *Bynum* (1971) 4 Cal.3d 589, 600-601 [94 Cal.Rptr. 241, 483 P.2d 1193], disapproved on other grounds in *People* v. *Williams* (1976) 16 Cal.3d 663, 669 [128 Cal.Rptr. 888, 547 P.2d 1000]) and constitutional (*Pointer* v. *Texas, supra,* 380 U.S. at p. 407 [85 S.Ct. at p.

1069]; *Dowdell* v. *United States* (1911) 221 U.S. 325, 330 [31 S.Ct. 590, 592, 55 L.Ed. 753]). Any conflicts or other discrepancies in the evidence did not render Lam's testimony unreliable. Credibility determinations are for the trier of fact, not the court. (See Evid. Code, § 405.)

With respect to Lam's status as an inmate at the time he overheard defendant's statements, no authority holds this circumstance requires exclusion of a witness's testimony.[3] We have consistently rejected claims such evidence is inherently unreliable. (*People* v. *Payton, supra,* 3 Cal.4th at p. 1063.) We have also concluded that " '[w]hatever consideration a jailhouse informant may expect for testifying, the direct, compelling motive to lie is absent.' [Citation.]" (*People* v. *Hovey* (1988) 44 Cal.3d 543, 565 [244 Cal.Rptr. 121, 749 P.2d 776]; see also § 1127a, subd. (b).) Defendant presented no credible evidence Lam expected or received any consideration. The court expressly noted the transcript of Lam's guilty plea in his nonsupport case contained no indication of a deal. Moreover, defendant offered only the supposition that in exchange for his testimony Lam had been moved to a different jail and then released on his own recognizance (O.R.), which the trial court properly excluded as too remote and speculative. As the court observed, "all the circumstances surrounding his past which might have affected a bail reduction or an O.R." involved "all kinds of collateral matters . . . ." Furthermore, "[i]mpeachment by showing improper motive depends on *the witness'* state of mind" (*People* v. *Brown* (1970) 13 Cal.App.3d 876, 883 [91 Cal.Rptr. 904], disapproved on other grounds in *Donald L.* v. *Superior Court* (1972) 7 Cal.3d 592, 597 [102 Cal.Rptr. 850, 498 P.2d 1098], and *People* v. *Chi Ko Wong* (1976) 18 Cal.3d 698, 716, fn. 14 [135 Cal.Rptr. 392, 557 P.2d 976]), which may well be unrelated to subsequent events. Therefore, absent more specific proof of a deal, defendant's proffered evidence had little probative value. (See *People* v. *De La Plane* (1979) 88 Cal.App.3d 223, 244-245 [151 Cal.Rptr. 843]; *People* v. *Doran* (1972) 24 Cal.App.3d 316, 321 [100 Cal.Rptr. 886], disapproved on other grounds in *People* v. *Beamon* (1973) 8 Cal.3d 625, 629, fn. 2 [105 Cal.Rptr. 681, 504 P.2d 905], and *Evans* v. *Superior Court* (1974) 11 Cal.3d 617, 625, fn. 6 [114 Cal.Rptr. 121, 522 P.2d 681].)

Defendant contends the evidence was improperly excluded because he could have questioned Lam himself regarding any expectation of favorable

---

[3]In passing, defendant invites us to reconsider whether because of Lam's status the trial court had a sua sponte duty to give a cautionary instruction regarding his testimony. (See *People* v. *Mickey* (1991) 54 Cal.3d 612, 674-675 [286 Cal.Rptr. 801, 818 P.2d 84]; see also § 1127a, subd. (b).) For the reasons previously explained, we decline to do so. (See *People* v. *Payton* (1992) 3 Cal.4th 1050, 1059 & fn. 2 [13 Cal.Rptr.2d 526, 839 P.2d 1035]; *People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1250, fn. 13 [278 Cal.Rptr. 640, 805 P.2d 899]; *People* v. *Gonzalez, supra,* 51 Cal.3d at pp. 1209-1210 & fn. 5.)

treatment. (See Evid. Code, § 1202.) However, the relevance of direct inquiry of the witness concerning the possibility of consideration differs qualitatively from conjectural proof of an O.R. release following his testimony. Without more, the latter was properly ruled inadmissible whether or not Lam was on the stand. Cases relied on by defendant all involved restriction on cross-examination of a witness for specific bias, motive, or interest. (E.g., *People* v. *Duran* (1976) 16 Cal.3d 282, 294-295 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1]; *People* v. *Brown, supra,* 13 Cal.App.3d at p. 883; *Smith* v. *Illinois* (1968) 390 U.S. 129, 131 [88 S.Ct. 748, 749-750, 19 L.Ed.2d 956].) Here, the court's ruling had no such effect; it simply foreclosed evidence of such speculative and marginal impeachment value it was likely to confuse or mislead the jury. (Evid. Code, § 352; cf. *Mattox* v. *United States* (1895) 156 U.S. 237, 245-246 [15 S.Ct. 337, 340-341, 39 L.Ed. 409] [defendant must satisfy foundational requirements before impeaching deceased former witness].)

Because defendant committed his crimes prior to the passage of Proposition 8, the trial court also properly excluded specific instances of misconduct, including evidence Lam used an alias, obtained a driver's license under a false name, and had been convicted of other offenses in addition to the felony child support violation he acknowledged in his testimony. (See generally, *People* v. *Wheeler* (1992) 4 Cal.4th 284, 290-293 [14 Cal.Rptr.2d 418, 841 P.2d 938]; cf. *People* v. *Mickle* (1991) 54 Cal.3d 140, 168 [284 Cal.Rptr. 511, 814 P.2d 290] [reaching a different conclusion under post-Proposition 8 law].) Evidence Code section 1202 limited impeachment of a hearsay declarant to that which "would have been admissible had the declarant been a witness at the hearing." As the trial court correctly found, the proffered evidence constituted specific instances of conduct, which, under pre-Proposition 8 law, Evidence Code section 787 were prohibited "to attack or support the credibility of a witness." Lam's prior convictions also did not qualify as impeachment under Evidence Code section 788. (See generally, *People* v. *Beagle* (1972) 6 Cal.3d 441, 451-453 [99 Cal.Rptr. 313, 492 P.2d 1].) Defendant submitted no other theory of admissibility. In *People* v. *Mayfield* (1972) 23 Cal.App.3d 236, 243 [100 Cal.Rptr. 104], the offer of proof regarding specific acts by the unavailable hearsay declarant "went to his credibility in showing possible bias, interest or motive, as well as to his reliability as a witness," and therefore "was admissible under Evidence Code section 780, subdivision (f)." Lam's misconduct did not relate to any aspect of credibility within the ambit of Evidence Code section 780.

Nor did the court err in excluding Lam's booking photograph. The sole justification for its introduction was that Harold Arnold, who testified to his

opinion of Lam's truthfulness, knew Lam only under the assumed name of Lance Andrew Martin. The defense wanted to use the photo to establish they were one and the same person. The prosecutor objected under Evidence Code section 352 and offered to stipulate to identity. Under the circumstances, we discern no meaningful or relevant impeachment defendant could have derived from admission of the photograph itself; and in light of the stipulation, his defense was not impaired. The trial court did not abuse its discretion.

Finally, defendant contends the trial court erroneously refused to take judicial notice of several newspaper articles regarding the crimes that appeared about the time Lam overheard defendant's remarks, theorizing Lam had some other source of information and fabricated his testimony on that basis. He did not seek to introduce the actual articles (cf. Evid. Code, § 645.1); rather, he requested notice of only certain facts to avoid introducing prejudicial material each contained. The court properly rejected the request. Evidence Code section 452, subdivision (h), authorizes judicial notice of "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." This "include[s], for example, facts which are accepted as established by experts and specialists in the natural, physical, and social sciences, if those facts are of such wide acceptance that to submit them to the jury would be to risk irrational findings." (Recommendation Proposing an Evidence Code (Jan. 1965) 7 Cal. Law Revision Com. Rep. (1965) p. 80; *Gould v. Maryland Sound Industries, Inc.* (1995) 31 Cal.App.4th 1137, 1145 [37 Cal.Rptr.2d 718].) The proffered articles did not come within the scope of this provision. Accordingly, the trial court properly declined the request.

E. *Reference to Defendant's Political Beliefs as Aggravating Factor*

Defendant contends the trial court improperly permitted the use of his constitutionally protected political beliefs as an impermissible factor in aggravation and in violation of his rights. The court admitted his "Last Will and Testament" dated the day of the murder, which referred to his desire to have a "U.S.S.R." flag on his coffin. The court also refused to exclude or redact his diary, which contained numerous references to the SLA (Spanish Liberation Army), the Soviet Union, and his plans to buy guns and return to San Antonio to harm those he thought had wronged him. The prosecutor did not intend to use the diary in his case-in-chief, but held out the possibility it might be relevant on rebuttal. Although pressed to find it inadmissible for any purpose, the trial court reserved judgment pending completion of defendant's testimony. Without securing a definitive ruling, defendant introduced

the diary himself, assertedly "to minimize the impact and harm of this evidence."

With respect to the will, defendant did not object to its admission except for the reference to a U.S.S.R. flag on his coffin. Because it was a handwritten document, the prosecutor opposed any form of redaction. Even if the trial court erred in admitting the entire document, we find no possible prejudice on this record. Defendant's direct testimony revealed he had no knowledge of the Soviet Union, its leaders and thinkers, or any aspect of Communist philosophy or doctrine; nor did he purport any affiliation with the Communist Party. Craig Haney, who prepared a social history on defendant, confirmed this lack of political attitude. The prosecutor did not raise the issue either on cross-examination or in closing argument. The document was not read on the record when introduced; nor does it appear the exhibits went into the jury room during deliberations. Thus, the likelihood the jury drew a negative inference or association from the passing reference to a U.S.S.R. flag is extremely remote. There is no reasonable possibility the outcome would have been different had the court excluded the evidence. (*People* v. *Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135].)

We also reject defendant's contentions regarding the diary. Since he "is responsible for the introduction of [this] evidence, he cannot complain on appeal that its admission was error. [Citation.]" (*People* v. *Moran* (1970) 1 Cal.3d 755, 762 [83 Cal.Rptr. 411, 463 P.2d 763]; *Gjurich* v. *Fieg* (1913) 164 Cal. 429, 433 [129 P. 464].) Estoppel applies even if he acted preemptively to reduce the diary's impact: in either situation the record is equally devoid of any basis for finding error. (Cf. *Dawson* v. *Delaware* (1992) 503 U.S. 159, 162 [112 S.Ct. 1093, 1096, 117 L.Ed.2d 309] [defendant "continued to assert that the admission of the stipulated facts into evidence violated the Constitution"].) As matters stand, we can only speculate that the prosecutor would have sought to introduce it in rebuttal; that the trial court would have erroneously overruled a proper objection; and that its admission would have been prejudicial under whatever evidentiary circumstances then prevailed.

We also perceive no violation of First Amendment rights. *Dawson* v. *Delaware, supra,* 503 U.S. 159, is distinguishable. There, over the defendant's constitutional objection, the parties stipulated: " 'The Aryan Brotherhood refers to a white racist prison gang that began in the 1960's in California in response to other gangs of racial minorities. Separate gangs calling themselves the Aryan Brotherhood now exist in many state prisons including Delaware.' " (*Id.* at p. 162 [112 S.Ct. at p. 1096].) The Supreme Court acknowledged it had previously upheld "the consideration, in a capital

sentencing proceeding, of evidence of racial intolerance and subversive advocacy where such evidence was relevant to the issues involved." (*Id.* at p. 164 [112 S.Ct. at p. 1097]; see, e.g., *Barclay* v. *Florida* (1983) 463 U.S. 939, 949 [103 S.Ct. 3418, 3424, 77 L.Ed.2d 1134].) Thus, "just as the defendant has the right to introduce any sort of relevant mitigating evidence, the State is entitled to rebut that evidence with proof of its own. [Citation.]" (*Dawson* v. *Delaware, supra,* 503 U.S. at p. 167 [112 S.Ct. at pp. 1098-1099].) The vice in *Dawson,* however, was that "the inference which the jury was invited to draw . . . tended to prove nothing more than the abstract beliefs of the Delaware chapter [of the Aryan Brotherhood]." (*Id.* at p. 166 [112 S.Ct. at p. 1098].) It was thus not only irrelevant to the capital sentencing determination, it violated the defendant's First Amendment rights. (*Id.* at pp. 165, 167, 168 [112 S.Ct. at pp. 1097-1099].)

No similar constitutional concern arises on these facts. Defendant's diary entries did not discuss abstract political or philosophical beliefs, either his or those of an independent organization. (Cf. *Wisconsin* v. *Mitchell* (1993) 508 U.S. 476, 485 [113 S.Ct. 2194, 2199-2200, 124 L.Ed.2d 436].) Rather, they reflected racial antipathy toward certain persons, groups, and institutions he felt had wronged him. (See *Barclay* v. *Florida, supra,* 463 U.S. at pp. 942-944 [103 S.Ct. at pp. 3420-3422].) In fact, in closing argument, defense counsel characterized the writings as "express[ing] no political philosophy whatsoever," only personal anger, based on similar testimony by Craig Haney. The prosecutor did not question defendant on any aspect of the diary touching on freedom of expression or association, only his attitude toward and motivation for violence. (See, e.g., *Dawson* v. *Delaware, supra,* 503 U.S. at pp. 165, 167 [112 S.Ct. at pp. 1097-1099].) Likewise, in closing argument, the prosecutor utilized both the general tenor and certain specifics to rebut mitigating evidence of defendant's dominance by Gaitan and his return to religion while in prison. (*Id.* at pp. 167-168 [112 S.Ct. at pp. 1098-1099].) Thus, the diary was not used improperly as a factor in aggravation to persuade the jury death was appropriate because of defendant's beliefs. (See, e.g., *People* v. *Cox* (1991) 53 Cal.3d 618, 683 [280 Cal.Rptr. 692, 809 P.2d 351].)

F. *Introduction of Photographs*

█ Defendant moved to exclude certain photographs showing victim Parrott's body at the crime scene and her head wounds, arguing they were irrelevant to any penalty issue, cumulative of testimonial evidence, and unduly prejudicial. The prosecutor responded they were relevant to show intent to kill and to illustrate the testimony of Pickrell and the police officers as to the position of the victim's body and location of the bullet wounds.

After due consideration, the trial court admitted two photos of the crime scene and two of Parrott's head.

The trial court properly found the photographs relevant because they depicted the "circumstances of the crime," a statutory factor for the jury to weigh in aggravation or mitigation of penalty. (§ 190.3, factor (a); see *People* v. *Gonzalez, supra*, 51 Cal.3d at p. 1232; cf. *People* v. *Cain* (1995) 10 Cal.4th 1, 68 [40 Cal.Rptr.2d 481, 892 P.2d 1224] [proper for court to instruct penalty phase jury to consider circumstances of crime].) These circumstances included the execution-style form of the killing and the manner in which defendant inflicted victim Parrott's wounds, both fatal and nonfatal. They were also relevant to defendant's intent, which he put in issue by denying he planned to kill anyone when contemplating the robbery. (See *Ramos I, supra*, 30 Cal.3d at p. 576.) The pictures were also admissible notwithstanding the fact they served to corroborate testimonial witnesses. (See *People* v. *Price* (1991) 1 Cal.4th 324, 441 [3 Cal.Rptr.2d 106, 821 P.2d 610], and cases cited.) "Because the photographic evidence could assist the jury in understanding and evaluating the testimony" (*ibid.*), the trial court did not improperly refuse to exclude them as cumulative.

We also reject defendant's contention the court abused its broad discretion under Evidence Code section 352, the exercise of which "will not be disturbed on appeal unless the prejudicial effect clearly outweighs the photos' probative value. [Citations.]" (*Ramos I, supra*, 30 Cal.3d at pp. 576-577.) Although defendant argues otherwise, we conclude, having reviewed the evidence, "the photos in question are not unduly gory or gruesome and the trial court could properly find that each of the photographs provided sufficiently significant corroboration of Pickrell's [and other witnesses'] testimony to outweigh any potential prejudice." (*Id.* at p. 577.) Furthermore, the court excluded several pictures of Parrott's body taken at the crime scene after a police officer had turned it over. (*Ibid.*)

For the first time on appeal, defendant asserts the court's ruling violated various constitutional rights. Because he failed to object on these grounds at trial, the claim is not preserved. (*People* v. *Benson* (1990) 52 Cal.3d 754, 786, fn. 7 [276 Cal.Rptr. 827, 802 P.2d 330]; see *People* v. *Jackson* (1996) 13 Cal.4th 1164, 1214, fn. 5 [56 Cal.Rptr.2d 49, 920 P.2d 1254]; *People* v. *Crittenden, supra*, 9 Cal.4th at p. 135, fn. 10; *People* v. *Clair* (1992) 2 Cal.4th 629, 661, fn. 6 [7 Cal.Rptr.2d 564, 828 P.2d 705].)

G. *Evidence of Weapons Found in Gaitan's Apartment*

Defendant challenges the introduction of a disassembled .22-caliber rifle as well as a photograph of the contents of a blue duffel bag that

included portions of a weapon, all found in the apartment following the arrest of defendant and Gaitan. Defendant also contends the trial court erroneously permitted the prosecutor to cross-examine him regarding his purchase of a shotgun several months before the crimes.

 "A party desiring to preserve for appeal a challenge to the admission of evidence must comply with the provisions of Evidence Code section 353, which precludes reversal for erroneous admission of evidence unless: 'There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated to make clear the specific ground of the objection or motion.'" (*People* v. *Morris* (1991) 53 Cal.3d 152, 187 [279 Cal.Rptr. 720, 807 P.2d 949], disapproved on other grounds in *People* v. *Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1 [38 Cal.Rptr.2d 394, 889 P.2d 588].) A properly directed motion *in limine* may satisfy the requirements of Evidence Code section 353 and preserve objections for appeal. (53 Cal.3d at p. 190.) However, the proponent must secure an express ruling from the court. (*Id.* at p. 195.)

 Although the record is not entirely clear, it appears defendant's pretrial motion to exclude items seized pursuant to the search warrant included an objection to introduction of the .22-caliber rifle as irrelevant under section 190.3. The court subsequently discussed generally the admissibility of evidence with counsel in anticipation of testimony. The record reflects no specific objection to the photograph and no reference to the gun at that time. The court never made a definitive ruling as to the relevance of either. Defense counsel expressly reserved further argument and did not reassert an objection on any ground when the prosecution actually introduced the photo and the disassembled rifle.

Under these circumstances, we find defendant has failed to preserve the issue for appeal. (See *People* v. *Morris, supra,* 53 Cal.3d at pp. 189-190; *People* v. *Hendricks* (1988) 44 Cal.3d 635, 648-649 [244 Cal.Rptr. 181, 749 P.2d 836].) Because the trial court did not rule on his objections *in limine,* he "was obligated to press for such a ruling and to object to [the evidence] until he obtained one. He failed to do so, thus depriving the trial court of the opportunity to correct potential error." (*People* v. *Morris, supra,* 53 Cal.3d at p. 195.) Even assuming otherwise, we find no error in the admission of this evidence because defendant admitted in his testimony that he used a .22-caliber rifle to commit the robbery and murder. (Cf. *Ramos I, supra,* 30 Cal.3d at p. 580.)

With respect to cross-examination questions, there is also no record of an objection on specified grounds. At best, the prosecutor suggested a possible

basis: "If he's making a 352 objection, I think the prejudice is very minimal . . . ." However, defense counsel never adopted, endorsed, or ratified the inference or requested an appropriate ruling from the court pursuant to Evidence Code section 352. While "Evidence Code section 353 does not exalt form over substance" (*People* v. *Morris, supra,* 53 Cal.3d at p. 188), it does require sufficient specificity of evidence and legal grounds for the opposing party to respond if necessary, for the trial court to determine the question intelligently, and for the appellate court to have a record adequate to review for error. Defendant's purported objection allowed for none of these.

In any event, we find no error. The prosecutor asked only one question, which followed defendant's testimony he had disposed of the murder weapon after the killing. Defendant had indicated the gun belonged to Gaitan. The prosecutor took the view "he's trying to create the impression that he had nothing [to] do with firearms, that's misleading" since he had previously admitted purchasing one "within a few months of the crime." In these circumstances, the trial court properly allowed the brief reference to remain on the record. (Cf. *People* v. *Zerillo* (1950) 36 Cal.2d 222, 228 [223 P.2d 223].)

As with the crime scene photographs, defendant for the first time on appeal argues introduction of this evidence violated his Eighth Amendment rights. He did not object on that basis at trial and failed to preserve the issue. (*People* v. *Benson, supra,* 52 Cal.3d at p. 788.)

H. *Introduction of Defendant's Weapon Possession at San Quentin Prison*

 Defendant contends the prosecutor committed prejudicial misconduct and the trial court erroneously denied a motion for mistrial after the prosecutor cross-examined Martha Ahumada regarding her knowledge of defendant's possession of handmade knives while in prison. Defendant had been cited for possession on five occasions during June and July 1984. The prosecutor introduced this evidence to impeach Ahumada's testimony about the sincerity of defendant's renewed involvement with religion while incarcerated.

We find no error. On direct examination, Ahumada testified to her visits with defendant at San Quentin when they "talked about church," "about the Lord," "about serving Him, seeking Him, His consolation for us, His strengthening for us." From these conversations, she perceived "a recommitment toward his religion." "He would start having these prayer meetings and

he felt more in contact, more at ease, more tranquil with the Lord." Defendant would also "motivate" or "invite" other inmates to attend and participate in the prayer sessions. This testimony tended to suggest not only devout faith but concern for others to embrace its spiritual benefits by turning away from past misdeeds involving force and violence. Other witnesses had established that the Church of la Luz del Mundo was a Christian-based sect, implying tenets of nonviolence.

 "It is well established that, '[w]hen a defense witness, other than the defendant himself, has testified to the reputation of the accused, the prosecution may inquire of the witness whether he has heard of acts or conduct by the defendant inconsistent with the witness' testimony.' [Citation.] So long as the People have a good faith belief that the acts or conduct about which they wish to inquire actually took place, they may so inquire. [Citation.]" (*People* v. *Siripongs* (1988) 45 Cal.3d 548, 578 [247 Cal.Rptr. 729, 754 P.2d 1306]; *People* v. *Fierro* (1991) 1 Cal.4th 173, 239 [3 Cal.Rptr.2d 426, 821 P.2d 1302]; see *People* v. *Boyd*, *supra*, 38 Cal.3d at pp. 775-776.) The same principles apply when a witness gives character testimony. In light of Ahumada's portrayal of defendant's religious recommitment, the prosecution could impeach her testimony with acts tending to contradict that impression. Evidence of weapons possession, particularly in a prison environment, would reasonably implicate a violent character whether defendant intended to use them offensively or defensively. (Cf. *People* v. *Harris* (1981) 28 Cal.3d 935, 963 [171 Cal.Rptr. 679, 623 P.2d 240].) We thus do not have a case in which either the prosecution presented undifferentiated "bad character" evidence in response to general "good character" evidence or the cross-examination exceeded the temporal scope of the direct. (See, e.g., *People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1191-1193 [270 Cal.Rptr. 286, 791 P.2d 965]; see also *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 792, fn. 24 [230 Cal.Rptr. 667, 726 P.2d 113].)

The prosecutor did not engage in misconduct in failing to raise the issue *in limine*; the primary concern in restricting impeachment inquiry of this nature is with the good faith belief in its foundation. As we explained in *People* v. *Eli* (1967) 66 Cal.2d 63, 79 [56 Cal.Rptr. 916, 424 P.2d 356], "Counsel must not be permitted to take random shots at a reputation imprudently exposed, or to ask groundless questions 'to waft an unwarranted innuendo into the jury box' [citation]. . . . There is also a responsibility on trial courts to scrupulously prevent cross-examination based upon mere fantasy." "One of the dangers sought to be minimized by *Eli* was that of the question, based upon a paucity or total lack of factual support, which is asked with little or no hope of affirmative response and with the basic purpose of creating through innuendo that which cannot be established by proof. [Citations.]"

(*People* v. *Gonzales* (1967) 66 Cal.2d 482, 502 [58 Cal.Rptr. 361, 426 P.2d 929].) No such danger arose here since the prosecutor had certified records substantiating defendant's weapons possession.

We also find the evidence properly admitted under section 190.3, factor (b). "It is settled that a defendant's knowing possession of a potentially dangerous weapon in custody is admissible under factor (b). Such conduct is unlawful and involves an implied threat of violence even where there is no evidence defendant used or displayed it in a provocative or threatening manner. [Citations.] The trier of fact is free to consider any 'innocent explanation' for defendant's possession of the item, but such inferences do not render the evidence inadmissible per se. [Citation.]" (*People* v. *Tuilaepa*, *supra*, 4 Cal.4th at p. 589; *People* v. *Harris*, *supra*, 28 Cal.3d at pp. 962-963.)

Defendant also challenges additional references during closing argument. He failed to object at the time and seek an admonition and thus did not preserve the issue for appeal. (*People* v. *Berryman* (1993) 6 Cal.4th 1048, 1072 [25 Cal.Rptr.2d 867, 864 P.2d 40]; *People* v. *Green*, *supra*, 27 Cal.3d at p. 27.) In any event, we find no error. On redirect examination, Ahumada testified defendant's religion did not prohibit acts in self-defense. Defendant and others presented evidence that his possession of the handmade knives occurred after inmate overflow necessitated his transfer from death row to "C section," a lockup facility housing prison gang members and other "troublemakers." Because he did not belong to a gang, he was concerned for his physical safety and only intended to use the knives defensively. The prosecutor's argument simply suggested an alternate implication and urged the jury to draw a less favorable inference. (See, e.g., *People* v. *Rodriguez*, *supra*, 42 Cal.3d at p. 791.)

I. *Exclusion of Testimony Regarding Defendant's Weapon Possession*

 Defendant proffered the testimony of John Irwin, a professor of sociology and expert on prisons and prisoners, to explain the circumstances of incarceration at San Quentin prison that might prompt an inmate to possess a weapon in self-defense. The relevant period of defendant's possession was June and July 1984. Irwin had no personal knowledge of conditions in C section later than May 1983, when he had interviewed two or three non-death-row prisoners in that part of San Quentin. His only later information came from a 1984 review of Department of Corrections documents regarding administrative segregation at San Quentin generally and discussions after 1986 with attorneys and others involved in federal litigation over prison conditions. He proposed to testify to the situation during the

summer of 1984 based on his "general familiarity" with lockup conditions. He also acknowledged that circumstances concerning C section with regard to the "overflow from death row" were "very fluid"; "things were very much in flux." The trial court sustained an objection to this evidence for lack of foundation.

█ The qualification of expert witnesses, including foundational requirements, rests in the sound discretion of the trial court. (*Huffman* v. *Lindquist* (1951) 37 Cal.2d 465, 476 [234 P.2d 34, 29 A.L.R.2d 485]; cf. Evid. Code, § 802.) That discretion is necessarily broad: "The competency of an expert 'is in every case a relative one, i.e. relative to the topic about which the person is asked to make his statement.' [Citation.]" (*Huffman* v. *Lindquist, supra,* 37 Cal.2d at pp. 476-477.) Absent a manifest abuse, the court's determination will not be disturbed on appeal. (*People* v. *Fudge* (1994) 7 Cal.4th 1075, 1115 [31 Cal.Rptr.2d 321, 875 P.2d 36]; *People* v. *Ashmus* (1991) 54 Cal.3d 932, 971 [2 Cal.Rptr.2d 112, 820 P.2d 214].)

█ We find no abuse under the circumstances. Only after considerable voir dire by both counsel as well as its own questioning of the witness did the trial court conclude Irwin lacked both sufficient personal knowledge of conditions in C section during June and July 1984 and an adequate basis for formulating a relevant expert opinion notwithstanding his general qualifications. (See *Korsak* v. *Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1523-1524 [3 Cal.Rptr.2d 833].) It is clear from the record he could only interpolate the likely conditions while defendant was housed in C section, a time he admitted was somewhat unstable. Although the court could have admitted this evidence, leaving its weight to the jury, exclusion was also within the range of discretion. (See *People* v. *Sundlee* (1977) 70 Cal.App.3d 477, 484-485 [138 Cal.Rptr. 834].)

The ruling did not deprive defendant of a defense or violate any other constitutional right. The United States Supreme Court has repeatedly acknowledged "the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures." (*Chambers* v. *Mississippi* (1973) 410 U.S. 284, 302-303 [93 S.Ct. 1038, 1049, 35 L.Ed.2d 297]; see *California* v. *Green, supra,* 399 U.S. at p. 154 [90 S.Ct. at pp. 1932-1933]; *Washington* v. *Texas* (1967) 388 U.S. 14, 23, fn. 21 [87 S.Ct. 1920, 1925, 18 L.Ed.2d 1019].) This authority extends to conditioning admissibility of certain evidence on foundational prerequisites. (*People* v. *Hawthorne* (1992) 4 Cal.4th 43, 56-57 [14 Cal.Rptr.2d 133, 841 P.2d 118].) "As a general proposition, criminal defendants are not entitled to any deference in the application of these constraints but, like the prosecution, 'must comply with established rules of procedure and evidence designed to assure both fairness and reliability . . . .' [Citation.]" (*Id.* at p. 57.)

The foundational requirements governing expert testimony are reasonably and rationally formulated to ensure the relevancy of such evidence. (See Evid. Code, §§ 801-803.) They are not " 'applied mechanistically to defeat the ends of justice.' " (*Green* v. *Georgia* (1979) 442 U.S. 95, 97 [99 S.Ct. 2150, 2151-2152, 60 L.Ed.2d 738]; see also *Chambers* v. *Mississippi, supra,* 410 U.S. at pp. 294, 297-298, 302 [93 S.Ct. at pp. 1045, 1046-1047, 1049].) Trial courts exercise broad discretion in these matters, consistent with constitutional principles. (See, e.g., *People* v. *Price, supra,* 1 Cal.4th at p. 416; cf. *People* v. *Hawthorne, supra,* 4 Cal.4th at pp. 57-58.) Moreover, in this case the excluded evidence was not critical to the defense. (Cf. *Chambers* v. *Mississippi, supra,* 410 U.S. at p. 302 [93 S.Ct. at p. 1049].) Defendant himself had already testified to the conditions in C section and his reasons for having the weapons. In addition, Craig Haney, an equally credentialed expert, presented testimony comparable to Irwin's. (Cf. *People* v. *Lucero* (1988) 44 Cal.3d 1006, 1029 [245 Cal.Rptr. 185, 750 P.2d 1342] [excluded evidence " 'differed in quality and substance' " from that of other witnesses].) While the prosecutor questioned Haney's conclusions regarding defendant's future positive adjustment in light of the weapon possession, he did not attempt to cast doubt on testimony that gang members were housed in C section and posed a threat to non-gang-affiliated prisoners. Had Irwin testified, he would have been subject to similar impeachment.

In his reply brief, defendant cites in passing *Skipper* v. *South Carolina* (1986) 476 U.S. 1 [106 S.Ct. 1669, 90 L.Ed.2d 1]. That decision is not on point. In *Skipper*, as well as in its antecedents and progeny, the trial court had excluded or restricted consideration of *otherwise admissible* mitigating evidence because it was deemed irrelevant to the capital sentencing determination. (*Id.* at p. 3 [106 S.Ct. at p. 1670]; see also *Hitchcock* v. *Dugger* (1987) 481 U.S. 393, 396-397 [107 S.Ct. 1821, 1823-1824, 95 L.Ed.2d 347]; *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 114-115 [102 S.Ct. 869, 876-877, 71 L.Ed.2d 1]; *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604-605 [98 S.Ct. 2954, 2964-2965, 57 L.Ed.2d 973] (plur. opn. of Burger, C. J.).) "In those cases, the constitutional defect lay in the fact that relevant mitigating evidence was placed beyond the effective reach of the sentencer." (*Graham* v. *Collins* (1993) 506 U.S. 461, 475 [113 S.Ct. 892, 902, 122 L.Ed.2d 260].) Here, the trial court determined Irwin's proffered testimony was irrelevant because defendant failed to satisfy the foundational prerequisites. (Evid. Code, § 801.) Had he done so and thereby established its relevance, the court would have admitted the evidence.

J. *Exclusion of Mitigating Evidence*

▪ Defendant contends the trial court erroneously sustained hearsay objections to certain mitigating evidence: his elementary school records

documenting his low intelligence; a letter to his guardian from a school psychologist detailing his low intellectual capacity; evidence of his honorable discharge from the military; his entire prison record showing good institutional adjustment; testimony by Robert Garces recounting Gaitan's antisocial writings and comments establishing defendant's lesser culpability because of Gaitan's influence.

On appeal, defendant fails to demonstrate error. Even if relevant, hearsay evidence is inadmissible "[e]xcept as provided by law . . . ." (Evid. Code, § 1200, subd. (b); see *id.*, § 351.) Depending upon the nature of the hearsay exception, the "law" interposes certain foundational requirements. Defendant never attempted to establish the documents came within any particular exception. Assuming his elementary school reports, the psychologist's letter, his military discharge, and his prison record might otherwise constitute records by public employees, Evidence Code section 1280 requires proof such a writing was "made as a record of" and "at or near the time of" an "act, condition, or event" as well as "by and within the scope of duty of a public employee." (Evid. Code, § 1280, subds. (a) & (b).) The court must also be satisfied the "sources of information and method and time of preparation were such as to indicate its trustworthiness." (*Id.*, subd. (c).) More likely, the documents were business records under Evidence Code section 1271, which requires in addition that a "custodian or other qualified witness testifies to its identity and the mode of its preparation . . . ." (Evid. Code, § 1271, subd. (c).)

Under either exception, "[i]n addition to the statutory requirements, the courts have imposed some conditions relative to the admissibility of a public record: (a) the record must be made by an official pursuant to governmental duty; [citations], and, (b) the record must be based upon the observation of an informant having a duty to observe and report. [Citation.] In this regard, a record based on the statements of third parties, e.g., an auto accident report compiled by the police, is inadmissible. [Citation.]" (*People* v. *Flaxman* (1977) 74 Cal.App.3d Supp. 16, 20 [141 Cal.Rptr. 799]; see, e.g., *MacLean* v. *City & County of S.F.* (1957) 151 Cal.App.2d 133, 143 [311 P.2d 158]; *Reisman* v. *Los Angeles City School Dist.* (1954) 123 Cal.App.2d 493, 505-506 [267 P.2d 36]; *Pruett* v. *Burr* (1953) 118 Cal.App.2d 188, 200-201 [257 P.2d 690].)

Nowhere in the record did defendant attempt to meet these prerequisites. As the proponent, the burden of producing evidence sufficient to establish the necessary foundation fell to him. (See generally, Evid. Code, §§ 110, 405, subd. (a), 550, subd. (a); see also *People* v. *Rodriquez* (1969) 274 Cal.App.2d 770, 777 [79 Cal.Rptr. 240].) We will not assume error in the

absence of a record affirmatively supporting such a finding. (Evid. Code, § 354; see *People* v. *Rodriquez, supra,* 274 Cal.App.2d at p. 777.) Moreover, it appears only limited portions of the documents were relevant, but defendant sought to introduce them in their entirety.

We reach a similar conclusion with respect to questions posed to Robert Garces concerning Gaitan's writings. As a condition precedent to challenging the exclusion of proffered testimony, Evidence Code section 354, subdivision (a), requires the proponent make known to the court the "substance, purpose, and relevance of the excluded evidence . . . ." This requirement applies equally to establishing a hearsay exception. (See *People* v. *Rodriquez, supra,* 274 Cal.App.2d at p. 777; see also *People* v. *Whitt, supra,* 51 Cal.3d at p. 648.) During the direct examination of Robert Garces, the prosecutor interposed two hearsay objections to questions regarding the contents of letters the witness received from Gaitan around the time of the crimes. In response, defendant did not make an offer of proof as to the substance of the anticipated testimony, cite a hearsay exception, or argue a nonhearsay purpose. Accordingly, he failed to preserve the issue. (See *People* v. *Pride* (1992) 3 Cal.4th 195, 237 [10 Cal.Rptr.2d 636, 833 P.2d 643]; *People* v. *Whitt, supra,* 51 Cal.3d at p. 648; *People* v. *Rodriquez, supra,* 274 Cal.App.2d at p. 777.)

For the reasons discussed in the preceding section, we also find no constitutional error in the exclusion of this evidence under *Chambers* v. *Mississippi, supra,* 410 U.S. 284, or *Skipper* v. *South Carolina, supra,* 476 U.S. 1. The high court has never suggested these decisions abrogated "the respect traditionally accorded to the States" in formulating and applying reasonable foundational requirements. (*Chambers* v. *Mississippi, supra,* 410 U.S. at p. 302 [93 S.Ct. at p. 1049]; see *Johnson* v. *Texas* (1993) 509 U.S. 350, 361 [113 S.Ct. 2658, 2665-2666, 125 L.Ed.2d 290]; *McKoy* v. *North Carolina* (1990) 494 U.S. 433, 456 [110 S.Ct. 1227, 1240, 108 L.Ed.2d 369]; see also *Skipper* v. *South Carolina, supra,* 476 U.S. at pp. 5-6 [106 S.Ct. at pp. 1671-1672]; cf. *People* v. *Fudge, supra,* 7 Cal.4th at pp. 1115-1116.) "[F]oundational prerequisites are fundamental to any exception to the hearsay rule. [Citations.]" (*People* v. *Hawthorne, supra,* 4 Cal.4th at p. 57.) "As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense." (*People* v. *Hall, supra,* 41 Cal.3d at p. 834.) Defendant has failed to demonstrate any infringement, particularly since all of the excluded evidence would only have served to corroborate other testimony informing the jury of the same or comparable facts. (*People* v. *Stanley, supra,* 10 Cal.4th at p. 826; see *People* v. *Young* (1945) 70 Cal.App.2d 28, 32-33 [160 P.2d 132].) Several witnesses who knew defendant in San Antonio described his poor achievement in school

and the influence of Gaitan. Defendant himself testified without challenge to his honorable discharge. Craig Haney gave considerable testimony regarding defendant's prison behavior. The court's rulings thus did not preclude the presentation of a defense.

### K. *Exclusion of Evidence Relating to Jailhouse Infractions*

 Defendant claims the trial court improperly curtailed his cross-examination of Deputy Sheriff Cejka by precluding questions regarding jail inmate complaints against him for brutality and harassment as well as his practice of shining his flashlight at inmates. On cross-examination, defense counsel asked the witness whether he was currently under investigation by internal affairs for harassment. Counsel acknowledged he did not have "the specifics" and did not know when the investigation had commenced; he only knew there were two or three complaints. The court sustained a relevance objection. The court sustained further objection when counsel asked the witness whether "some inmates have made complaints against you for shining the light in their eyes directly?"

The court's rulings were correct. As to the alleged complaints against Cejka for shining his flashlight inappropriately, defendant did not explain its relevance or otherwise establish its admissibility. Accordingly, he failed to preserve the issue for appellate review. (See Evid. Code, § 354; *People v. Rodriquez, supra*, 274 Cal.App.2d at p. 777.)

The defense attempted to justify questioning Cejka regarding alleged inmate complaints of brutality and harassment on the basis that "his character and the way he treats inmates is always an issue." It is unclear what aspect of the witness's "character" might be established by two or three complaints of misconduct. It is even less clear what relevance this "character" had to the proceedings. "Evidence of a person's character or a trait of his character is relevant in three situations: (1) When offered on the issue of his credibility as a witness; (2) when offered as circumstantial evidence of his conduct in conformity with such character or a trait of his character; and (3) when his character or a trait of his character is an ultimate fact in dispute in the action. [Citation.]" (*Carr v. Pacific Tel. Co.* (1972) 26 Cal.App.3d 537, 544 [103 Cal.Rptr. 120].) As previously noted, pre-Proposition 8 law governs this case. Therefore, Evidence Code section 786 prohibited evidence of character traits "other than honesty or veracity" "to attack or support the credibility of a witness." (See also Evid. Code, § 787; cf. *People v. Wheeler, supra*, 4 Cal.4th at pp. 290-295 [Proposition 8 abrogated Evidence Code sections 787 and 788]; *People v. Harris* (1989) 47 Cal.3d 1047, 1081 [255 Cal.Rptr. 352, 767 P.2d 619] [suggesting Proposition 8 abrogated Evidence Code section 786].) Brutality and harassment do

not involve "honesty or veracity"; nor do these traits appear relevant to credibility in any other respect. (See Evid. Code, § 780.) Plainly, they were not "an ultimate fact in dispute" in determining defendant's penalty. (Cf. *People* v. *Memro*, *supra*, 38 Cal.3d at pp. 682-683.)

The record also does not establish any basis for finding the complaints relevant as circumstantial evidence Cejka acted in conformity with such character. Assuming the flashlight incident constituted "harassment," he did not deny he directed his light into defendant's cell. He was never specifically asked whether he shined it in defendant's eyes as the latter claimed. The only significant discrepancy in their testimony concerned whether defendant responded by threatening, "I'll see you in the chow hall," which defendant denied. That conflict merely raised a question of respective credibility. The complaints were thus irrelevant as circumstantial evidence to prove conduct in conformity with any purported character or trait of character. (See also Evid. Code, § 1101, subd. (a).)

### L. *Refusal to Instruct Jury to Disregard Prior Death Sentence*

 Defendant asserts the trial court erroneously refused to instruct the jury not to consider the prior death verdict. Immediately prior to closing argument, defense counsel broached the subject for the first time: "Would the court have an objection if I fashioned an instruction at the break regarding that?" The court indicated it was "disinclined to add anything to the package," and counsel never submitted a proposed instruction. Following the verdict, defendant moved for a new trial, in part on instructional grounds. The court responded, "On the day of argument, just before we started argument, there was a comment made by [defense counsel] whether the court would consider providing such an instruction if one was drafted during the break in argument. I felt it was an untimely request and did not permit that to be done in view of the fact that we spent a lot of time getting instructions ready and both sides were ready to argue." Additionally, the court noted the jurors were apprised of their duty to disregard the former verdict during the jury selection process.

We find no error. Section 1093.5 expressly requires that except for issues arising during argument, "all requests for instructions on points of law must be made to the court and all proposed instructions must be delivered to the court before commencement of argument. Before the commencement of argument, the court, on request of counsel, must: (1) decide whether to give, refuse, or modify the proposed instructions; (2) decide which instructions shall be given in addition to those proposed, if any; and (3) advise counsel of all instructions to be given. . . ." Delivery presupposes a written presentation to afford an intelligible basis and orderly manner for making these

determinations. (*People* v. *Terry* (1969) 70 Cal.2d 410, 420, fn. 4 [77 Cal.Rptr. 460, 454 P.2d 36].)

In anticipation of argument, the court "set three or four days aside just to go over instructions" and to finalize agreement on the precise language. Besides the standard CALJIC instructions, both parties submitted "specials" covering additional matters, which the court addressed after due consideration. However, although the court noted the argument schedule well in advance, defendant failed to provide a proposed instruction regarding the prior death verdict and only alluded to the issue as argument was set to begin. Being untimely and not in proper form, it was justifiably refused.

Moreover, the omission did not transgress any constitutional guarantee. In *Romano* v. *Oklahoma* (1994) 512 U.S. 1 [114 S.Ct. 2004, 129 L.Ed.2d 1], the jury was not instructed in determining penalty to disregard the fact a capital defendant had already been sentenced to death in another case. Although the evidence may have been irrelevant, the Supreme Court found no Eighth Amendment or due process violation because "the jury was not affirmatively misled regarding its role in the sentencing process." (*Id.* at p. 9 [114 S.Ct. at p. 2010]; cf. *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [105 S.Ct. 2633, 86 L.Ed.2d 231].) "[I]f the jurors followed the trial court's instructions, which we presume they did [citation], this evidence should have had little—if any—effect on their deliberations. Those instructions clearly and properly described the jurors' paramount role in determining petitioner's sentence, and they also explicitly limited the jurors' consideration of aggravating factors to the four which the State sought to prove." (*Romano* v. *Oklahoma, supra,* 512 U.S. at p. 13 [114 S.Ct. at p. 2012].)

Similarly here, the trial court repeatedly directed the jury it must determine the appropriate penalty in light of the statutory factors in aggravation and mitigation. The court also expressly instructed that the determination depended upon each juror's individual weighing of those circumstances. Moreover, nothing in the evidence or argument of counsel was "inaccurate [or] misleading in a manner that diminished the jury's sense of responsibility." (*Caldwell* v. *Mississippi, supra,* 472 U.S. at p. 342 [105 S.Ct. at p. 2646] (conc. opn. of O'Connor, J.).) Accordingly, the omission of a specific instruction to disregard the prior death sentence was not error. (Cf. *People* v. *Medina* (1995) 11 Cal.4th 694, 726 [47 Cal.Rptr.2d 165, 906 P.2d 2].)

## M. *Miscellaneous Constitutional Challenges to Death Sentence*

### 1. *Disproportionality of Death Sentence*

██ Defendant contends his sentence is disproportionate because only a small number of robbery-related homicides result in death verdicts; codefendant Gaitan, who was morally more culpable, received a life sentence;

defendant's impoverished background and low intelligence as well as other factors mitigated his culpability.

"The law is now well established that the Eighth Amendment does not mandate intercase proportionality review." (*People* v. *Cox, supra,* 53 Cal.3d at p. 690; *Pulley* v. *Harris* (1984) 465 U.S. 37, 50 [104 S.Ct. 871, 879, 79 L.Ed.2d 29].) This principle applies equally whether the comparison involves sentences for other, similar crimes or sentences of codefendants. "Unless the state's capital punishment system is shown by the defendant to operate in an arbitrary and capricious manner, the fact that such defendant has been sentenced to death and others who may be similarly situated have not does not establish disproportionality violative of constitutional principles. [Citation.]" (*People* v. *McLain* (1988) 46 Cal.3d 97, 121 [249 Cal.Rptr. 630, 757 P.2d 569].) We find no showing in this case. Since the jury found the special circumstance allegation not true with respect to codefendant Gaitan, he was not eligible for the death penalty in any event.

Defendant's equal protection argument fares no better: " '[P]ersons convicted under the death penalty are manifestly not similarly situated to persons convicted under the Determinate Sentencing Act and accordingly cannot assert a meritorious claim to the "benefits" of the act under the equal protection clause [citations].' [Citation.] Defendant offers no factual or legal impetus to reconsider these conclusions." (*People* v. *Cox, supra,* 53 Cal.3d at p. 691; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1287-1288 [232 Cal.Rptr. 849, 729 P.2d 115].)

We reject defendant's intracase claim as well. (See *People* v. *Dillon* (1983) 34 Cal.3d 441, 477-489 [194 Cal.Rptr. 390, 668 P.2d 697]; see also *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921].) The appropriate standard is whether the death sentence " ' "is so *disproportionate* to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." [Citations.]' [Citations.]" (*People* v. *Cox, supra,* 53 Cal.3d at p. 690.) While we do not disregard the evidence offered in mitigation of defendant's penalty, we likewise cannot ignore his brutal, callous, and deliberate murder of a defenseless victim. Nothing in his background or lack of intelligence renders his sentence disproportionate to that crime.

2. *Unconstitutionality of Death Penalty Statute and Sentencing Process*

In summary fashion defendant presents an array of challenges to the constitutionality of the 1978 death penalty statute and the sentencing process. We have previously considered and rejected each of these contentions

and find no reason to reconsider those conclusions. We find no infirmity in the law either as written or as applied at his trial; nor did sentencing error occur in the exclusion of evidence.

 "No constitutional imperative requires written findings or jury unanimity as to aggravating circumstances, proof beyond a reasonable doubt of aggravating circumstances, or proof beyond a reasonable doubt that aggravating factors outweigh those in mitigation or that death is the appropriate penalty. [Citations.] . . . [Moreover], the United States Supreme Court has found no deficiency in the method or scope of appellate review utilized in California death penalty cases. [Citation.]" (*People* v. *Cox, supra*, 53 Cal.3d at p. 692.) Likewise, the Constitution does not require the trial court to delete inapplicable factors (*People* v. *Lewis* (1990) 50 Cal.3d 262, 280 [266 Cal.Rptr. 834, 786 P.2d 892]), modify the instruction to include specific mitigating factors presented at trial (see *People* v. *Wright* (1988) 45 Cal.3d 1126, 1134 [248 Cal.Rptr. 600, 755 P.2d 1049]), or designate which factors were mitigating and which aggravating (*People* v. *Jackson* (1980) 28 Cal.3d 264, 316 [168 Cal.Rptr. 603, 618 P.2d 149]). The court did not improperly refuse to admit evidence of prison conditions for an inmate serving a life sentence without the possibility of parole (cf. *People* v. *Whitt, supra*, 51 Cal.3d at pp. 644-645) or evidence of Gaitan's sentence (*People* v. *Dyer* (1988) 45 Cal.3d 26, 69-70 [246 Cal.Rptr. 209, 753 P.2d 1]). Finally, the prosecutor's use of peremptory challenges to remove prospective jurors who opposed the death penalty did not deprive defendant of a fair trial or reliable sentencing process. (*People* v. *Turner* (1984) 37 Cal.3d 302, 315 [208 Cal.Rptr. 196, 690 P.2d 669], overruled on other grounds in *People* v. *Anderson, supra*, 43 Cal.3d at p. 1115.)

### 3. *Failure to Determine Death Sentence Was Appropriate*

 Application for modification of a death penalty verdict is automatic. (§ 190.4, subd. (e).) In ruling on the application, the court can consider "only that which was before the jury" (*People* v. *Jennings* (1988) 46 Cal.3d 963, 995 [251 Cal.Rptr. 278, 760 P.2d 475]) and must determine "whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented." (§ 190.4, subd. (e).) Defendant contends the trial court failed to comply with these directives because it considered an unsworn statement by the victim's brother urging the death penalty and did not make an independent assessment of the evidence or state its reasons for refusing to modify the sentence. The record does not bear out these contentions.

Preliminarily, defendant failed to object to the statement he now contends the court erroneously considered, and therefore waived further review. (*People* v. *Hill* (1992) 3 Cal.4th 959, 1013 [13 Cal.Rptr.2d 475, 839 P.2d 984].)

The claim also fails on the merits. To begin, we again reject any argument that *Booth* v. *Maryland* (1987) 482 U.S. 496 [107 S.Ct. 2529, 96 L.Ed.2d 440], prohibiting victim impact statements, extends to proceedings under section 190.4, subdivision (e). (*People* v. *Benson, supra,* 52 Cal.3d at p. 812; cf. *Payne* v. *Tennessee* (1991) 501 U.S. 808, 830 & fn. 2 [111 S.Ct. 2597, 2611, 115 L.Ed.2d 720], overruling *Booth* v. *Maryland, supra,* 482 U.S. 496.) Nevertheless, the scope of a modification motion does not encompass statements of the victim's relatives or any other evidence not presented to the jury during the penalty phase trial. (*People* v. *Benson, supra,* 52 Cal.3d at p. 812; *People* v. *Jennings, supra,* 46 Cal.3d at p. 994.)

In this case, we find the trial court conscientiously and properly fulfilled its obligation under section 190.4, subdivision (e). Following extensive argument by defense counsel as well as allocution by defendant reiterating his remorse, it denied the motion for modification and in doing so made several comments relevant to the present contentions. Responding to the prosecutor's reference to the prior penalty verdict, the court expressly stated "it would [not] be proper" to consider the decision of the first jury or judge. It then reviewed the aggravating and mitigating circumstances "presented by both parties before this jury." Among other factors in mitigation, the court noted "psychological and social impairments" resulting from limitations on defendant since childhood, the "impact that Ruben Gaitan may have had," and defendant's expressions of remorse. However, given "the nature and the circumstance of the actual taking of the life of Katharyn Parrott," the jury's decision was not improper. At no time did the court comment on the statement by Parrott's brother.

This record affords no basis for finding the court failed to discharge its statutory obligation. (See *People* v. *Williams* (1988) 45 Cal.3d 1268, 1328 [248 Cal.Rptr. 834, 756 P.2d 221]; cf. *People* v. *Medina* (1990) 51 Cal.3d 870, 912 [274 Cal.Rptr. 849, 799 P.2d 1282].) While we disapprove the interjection of any matter not before the jury prior to a ruling on a motion for modification, the brief, apparently unemotional remark by Steven Parrott is unlikely to have had any impact in light of the court's remarks. (Cf. *People* v. *Fauber* (1992) 2 Cal.4th 792, 866 [9 Cal.Rptr.2d 24, 831 P.2d 249]; *People* v. *Benson, supra,* 52 Cal.3d at pp. 812-813.) We therefore need not reconsider our prior decisions in light of *Sochor* v. *Florida* (1992) 504 U.S. 527, 540 [112 S.Ct. 2114, 2123, 119 L.Ed.2d 326], in which the United States Supreme Court vacated a death penalty because the trial court considered a factor in aggravation unsupported by the evidence.

CONCLUSION

The judgment is affirmed.

George, C. J., Mosk, J., Baxter, J., Werdegar, J., and Chin, J., concurred.

**MOSK, J.**—I concur in the opinion of the court prepared by Justice Brown.

After careful review, I cannot deem reversible whatever error the superior court may have committed by assertedly not permitting defendant to ask prospective jurors, in accordance with language that would subsequently appear in *People* v. *Kirkpatrick* (1994) 7 Cal.4th 988, 1004 [30 Cal.Rptr.2d 818, 874 P.2d 248], "whether they would always . . . vote for the death penalty in cases involving any generalized facts . . . that were likely to be shown by the evidence at trial." The error, if such it be, is a violation solely of California decisional law. It is subject to review for harmlessness. (See *id.* at p. 1005.) In my view, it survives scrutiny. Notwithstanding any restriction by the superior court, there was in fact inquiry that was adequate to determine that none of the 12 persons who would be sworn as jurors and actually vote for the death penalty held "views on capital punishment" that "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841], quoting *Adams* v. *Texas* (1980) 448 U.S. 38, 45 [100 S.Ct. 2521, 2526, 65 L.Ed.2d 581].) Certainly, as to eight of the twelve, defendant posed questions that presented "generalized facts" similar to those that would be "shown by the evidence at trial"; as to four, he probed by like means. As to none can he now raise any doubt concerning the performance of his duties.

**KENNARD, J.,** Concurring and Dissenting.—I concur with the majority's affirmance of the special circumstance finding, but I cannot join the majority in affirming the death judgment against defendant Marcelino Ramos.

Because the trial court did not permit defense counsel to adequately question prospective jurors about their death penalty views, there is an unacceptable risk that the jury that returned the death verdict was not impartial.

A defendant's right to an impartial jury includes the right to an adequate voir dire to identify unqualified jurors. (*Morgan* v. *Illinois* (1992) 504 U.S. 719, 729-730 [112 S.Ct. 2222, 2229-2230, 119 L.Ed.2d 492].) In a capital case, a prospective juror is unqualified if the juror's views on capital punishment would prevent or substantially impair the performance of the juror's duties as a juror in accordance with the court's instructions and the juror's oath. (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841].) Under California law, a jury determines penalty in a capital case by a process of weighing aggravating and mitigating circumstances. (Pen. Code, § 190.3; see *People* v. *Bacigalupo* (1993) 6 Cal.4th 457, 467-470 [24 Cal.Rptr.2d 808, 862 P.2d 808].) "A prospective juror who

would invariably vote either for or against the death penalty because of one or more circumstances likely to be present in the case being tried, without regard to the strength of aggravating and mitigating circumstances, is therefore subject to challenge for cause . . . ." (*People* v. *Kirkpatrick* (1994) 7 Cal.4th 988, 1005 [30 Cal.Rptr.2d 818, 874 P.2d 248]; see also *People* v. *Livaditis* (1992) 2 Cal.4th 759, 772-773 [9 Cal.Rptr.2d 72, 831 P.2d 297]; *People* v. *Pinholster* (1992) 1 Cal.4th 865, 917-918 [4 Cal.Rptr.2d 765, 824 P.2d 571].) To identify such jurors, prosecutors and defense attorneys must be permitted to inquire on voir dire "whether [the prospective jurors] would always or never vote for the death penalty in cases involving any generalized facts . . . that [are] likely to be shown by the evidence at trial." (*People* v. *Kirkpatrick*, *supra*, at p. 1004.)

Here, the record shows that the trial court prohibited defense counsel from inquiring whether prospective jurors would vote for a verdict of death "automatically" or "without considering the defendant's life history" if the evidence showed that defendant committed a murder that was "intentional," "premeditated," or "planned in advance." Because the evidence showed that the capital murder committed by defendant was intentional, premeditated, and planned in advance, the trial court erred to defendant's prejudice in barring defense counsel from asking whether prospective jurors would *automatically* vote for the death penalty for such a murder.

The trial court made its ruling after the first day of individual voir dire of prospective jurors on their death penalty views. During that first day, which included the death penalty voir dire of one of the jurors who eventually participated in defendant's death verdict, defense counsel was permitted to ask questions such as, "Would you automatically impose the death penalty in any execution-style type murder that occurs in the course of a robbery?" Jurors who responded in the affirmative were excused for cause.

Thereafter, the trial court informed counsel that it had reconsidered the appropriateness of the previous day's voir dire and had concluded that "telling a juror that the circumstance of the crime is a particular type of description, that tends to put the juror in the position of prejudging the case." The court added: "I think what I may end up doing is precluding any description of the circumstances of the offense." Defense counsel protested that this would be "directly contra to the law." Defense counsel also said: "I think I need to ask the question about how they feel about automatically imposing a death penalty in a case where there's an intentional, premeditated, planned-in-advance killing." Before voir dire resumed, the court instructed counsel "not to get into asking the juror how they would evaluate premeditated or intentional killing." Defense counsel asked if the court

would permit this question: "If, after [the prosecutor] puts on evidence of the circumstances of the crime, you believe that the evidence shows it was planned, premeditated, and cruel, would you impose death without considering any other evidence about the defendant and his background?" The prosecutor said he objected to that form of question on voir dire. The court said, "I don't think you're entitled to ask that question," and the court stated that "if it is objected to, I will sustain the objection."

During the remainder of the death qualification voir dire, including the voir dire of the other 11 jurors who participated in the death verdict, defense counsel was not permitted to and did not ask jurors whether they would automatically vote for the death penalty if the murder was intentional, premeditated, or planned in advance. The only exceptions were on rare occasions when a prospective juror raised the subject by volunteering that he or she thought the death penalty should be imposed for such crimes.

Because the trial court did not permit defense counsel to inquire whether the prospective jurors would always vote for the death penalty in cases involving certain generalized facts likely to be shown by the evidence at trial—specifically, a murder that was intentional, premeditated, and planned in advance—the voir dire was inadequate to identify unqualified jurors. This error requires reversal of the judgment of death. (*Morgan* v. *Illinois, supra,* 504 U.S. 719, 739 [112 S.Ct. 2222, 2235].) Accordingly, I would reverse the judgment as to penalty only and remand for a new penalty trial before jurors whose impartiality has been adequately tested.

Appellant's petition for a rehearing was denied September 17, 1997. Kennard, J., was of the opinion that the petition should be granted.