Filed 4/6/15  P. v. Figge CA4/1

**REDACTED**
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D066962 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SWF1100774) |
| BRIAN KEITH FIGGE, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Riverside County, Albert J. Wojcik, Judge.  Affirmed.

Brown White & Newhouse and Kenneth P. White for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Parag Agrawal, Deputy Attorneys General, for Plaintiff and Respondent.

Brian Figge appeals from a judgment convicting him of various sex offenses arising from charges that he sexually molested Jane Doe 1 and Jane Doe 2.[1]  He argues the judgment must be reversed because the record does not support the trial court's excusal of a juror for failure to deliberate.  Additionally, he contends the court abused its discretion and deprived him of a fair trial by (1) excluding defense impeachment evidence, (2) admitting prosecution expert testimony on Child Sexual Abuse Accommodation Syndrome, and (3) excluding defense expert testimony opining that he lacked the attributes of a pedophile.

We find no reversible error and affirm.

In the proceedings before the trial court, a portion of the record relevant to the proffered defense impeachment evidence was sealed as mandated by statute.  To maintain the confidentiality of the sealed material, on appeal the parties filed redacted briefs available to the public and unredacted briefs under seal.  Because our resolution of defendant's claims requires discussion of the sealed material, the portion of this opinion available to the public has been redacted to remove Sections II and IV in which the sealed material is discussed.  The unredacted version of this opinion (containing Sections II and IV) has been filed under seal.

FACTUAL AND PROCEDURAL BACKGROUND

The molestation committed by defendant included three incidents of oral sex involving Jane Doe 1 in 2004, 2005, and 2006, and one incident of sodomy involving Jane

---

[1]    To preserve confidentiality, the victims were identified at trial as Jane Doe 1 and Jane Doe 2.  We use the same designation.

2

Doe 2 in 2010. Jane Doe 1, age 19 at the time of trial, testified that defendant first molested her when she was about 11 years old and in the sixth grade. He came to her bedroom late at night, sat on the edge of her bed, and said something like, "Oh, I have a favor, can you help me out." Defendant stood up, removed his boxers, and had Jane Doe 1 perform oral sex on him. Jane Doe 1 felt "really terrified" but defendant kept reiterating "the favor part of it and to not worry," and Jane Doe 1 thought "he must be right" although she did not really understand what was going on. Defendant told her not to say anything and to keep her "mouth shut."

The second and third incidents occurred during the following two years, when Jane Doe 1 was 12 and 13 years old and in the seventh and eighth grade, respectively. The incidents were essentially the same, involving Jane Doe 1 performing oral sex on defendant late at night in her bedroom. During the second incident, defendant said things like "You're gonna do this. . . . You want to do this. . . . You have to do this." Jane Doe 1 still felt "really scared" but she was "a little bit more coherent to the situation" and knew "it wasn't right." Defendant told her, "Don't tell . . . don't say anything, keep your mouth shut" and made small threats such as taking her cell phone away. During the third incident, Jane Doe 1 told defendant she did not want to do this anymore, and defendant said, "Don't say anything. . . . No one will know. . . . You don't want to get in trouble." On a fourth occasion when she was still in eighth grade and defendant came to her room, Jane Doe 1 told defendant "I'm not doing this anymore, this isn't gonna happen, this is wrong." Defendant started "backtracking a lot," saying "I'm sorry, I'm sorry, don't say anything, keep your mouth shut, don't tell . . . ." After this, there were no further incidents.

3

Jane Doe 1 testified she put the molestation "away for a really long time" and did not "revisit it until recently." Jane Doe 1 explained that she did not tell anyone about the molestation when it occurred because defendant told her not to; she did not want to cause more problems in her family; she was afraid; she thought defendant would be angry and call her a liar; she thought she could be "strong enough to hold it"; she thought she would get in trouble; and by the time of the last incident she realized defendant would get in trouble. Jane Doe 1 finally disclosed the molestation in March 2011 during a conversation with her boyfriend (Boyfriend 2) when she was 17 years old and a senior in high school.[2] Jane Doe 1 testified that she never really wanted to "be sexual" with Boyfriend 2 because it made her uncomfortable; he would repeatedly ask her why; and she finally told him what happened with defendant when she was younger. Boyfriend 2 reported what she said to the police, which upset Jane Doe 1 because at the time she did not want defendant prosecuted.

Jane Doe 2, age 13 at the time of trial, lived at defendant's home for about seven weeks when she was 10 years old and in the fifth grade, while her family was relocating and looking for a house to buy. Defendant molested her on one occasion while she was there. She was in the living room watching television and no one else was at home. When defendant came into the living room and Jane Doe 2 asked if she could finish watching her show, defendant said no. Apparently because of a dispute over the remote control, defendant hit Jane Doe 2 on her arm, and she started crying and went upstairs to her room. Defendant

---

[2] The defense proffered impeachment evidence from Jane Doe 1's previous boyfriend (Boyfriend 1), whom she dated when she was 16 years old, which we shall discuss below in our sealed, unredacted opinion.

went up to her room, pulled her off the bed, removed her pants and underwear, removed his pants, and put his "private part" inside her "butt." Defendant told her if she "told anybody [she] was gonna pay." She did not tell anyone that day because she was scared and thought defendant would hurt her.

More than one year later, in November 2011, Jane Doe 2 told her mother about the molestation when Jane Doe 2 got suspended from school in the seventh grade. Jane Doe 2's mother testified that she had previously told Jane Doe 2 that defendant and his wife were getting divorced and defendant had moved out of his home because he was "mean to [Jane Doe 1]." While Jane Doe 2 was home on suspension, Jane Doe 2 kept asking her mother to tell her what she meant by defendant being mean to Jane Doe 1, and when Jane Doe 2's mother did not provide any details, Jane Doe 2 finally said to her mother that defendant was mean to her and explained that he had "put his pee-pee in [her] butt." Jane Doe 2's mother contacted the police to report what her daughter said. Jane Doe 2 testified that she asked her mother whether defendant had molested Jane Doe 1 because she wanted to know if what happened to her had happened to someone else.

*Jury Verdict and Sentence*

For the offenses against Jane Doe 1, defendant was charged with lewd act, oral copulation, and aggravated sexual assault of a child during three different time periods. For the offense against Jane Doe 2, he was charged with forcible lewd act, sodomy, and aggravated sexual assault of a child in 2010. The information also alleged that he committed the offenses against more than one victim. The jury found defendant guilty as charged. The trial court sentenced him to four terms of 15 years to life for each of the aggravated sexual

5

offense convictions (for a total of 60 years to life), and stayed the sentences on the remaining counts.

## DISCUSSION

### I. *Excusal of Juror*

Defendant argues the trial court's decision to excuse a juror for failing to deliberate is unsupported by the record.

### A. *Background*

After about one and one-half days of deliberation, several jurors reported that Juror No. 11 was refusing to deliberate. The court convened a hearing and separately questioned four jurors, and then separately questioned Juror No. 11.

Juror No. 4 told the court that Juror No. 11 was being "very close minded and . . . he doesn't even want to talk about the whole scenario of what's going on here." Juror No. 4 explained that the jurors had discussed the case at length and Juror No. 11 had listened and heard what other jurors were saying, but he had "his mind made up" from the beginning of deliberations and has not changed his mind; he does not "want to even go there"; he does not "want to infer or look at anything"; and he said he did not "believe in these scenarios" and "in these kind of things." Juror No. 4 felt Juror No. 11 was failing to deliberate soon after the beginning of deliberations, explaining the jurors were trying to be fair and do their "jobs" and "go over everything," but Juror No. 11 did not "want to acknowledge that there was anything to talk about," and it appeared he had his mind made up and it did not matter what the other jurors were going to say.

6

Juror No. 8 told the court that she felt Juror No. 11 was failing to deliberate from the very beginning when they first "sat down," and it appeared from the discussions that Juror No. 11 "made up his mind before [they] ever entered the jury room." She explained that they started discussing the case, and Juror No. 11 said, "I just don't see any of it. . . . I can't put this together. It just does not make sense to me." Juror No. 8 elaborated that one of the jurors was very skilled at explaining everything from all angles and was trying to discuss the case from every angle, but it was very frustrating because they were not making progress. She stated Juror No. 11 was providing "no feedback," explaining "It's like you're staring at me and I'm gonna keep talking and you're not gonna say anything."

Juror No. 7 said she felt Juror No. 11 was being "very closed minded"; he made his decision "from the very, very beginning"; and he was not making a good faith effort to deliberate. For example, he would say "that's it. That's what I believe." In response, Juror No. 7 told Juror No. 11 that they were "here today to continue to talk about this and this is all part of the process" and this "is a very serious matter," but it seemed he was not cooperating with the process. Juror No. 7 stated that Juror No. 11 had complained that the other jurors were "badgering" him, but when jurors tried to listen and also interject at appropriate times, Juror No. 7 would say "he is just gonna shut down."

Juror No. 2 told the court that Juror No. 11 had a closed mind starting in the first hour of deliberations; he had his opinion "right away"; and he was not making an effort to deliberate. She stated that although he was listening and at times he was participating, it was also hard to tell if he was listening "because he is so shut down on what we're talking about" and "his opinion is so strong." She explained, "[H]e thinks it's good deliberating because

7

we're all talking. But he's not changing his mind in any way. And we've had three or four readbacks and nothing's changing." When the court noted there was nothing wrong with having an opinion and not changing his mind as long as he listens and discusses with everyone, Juror No. 2 agreed there was nothing wrong, but reiterated her view that Juror No. 11 has been "closed-minded from the beginning." She stated that when Juror No. 11 engages in discussions, he repeats the "same thing over and over again"; they were not getting anywhere with the deliberations; and it was clear Juror No. 11 was at a point that he was not going to change his mind.

After hearing from these four jurors, Juror No. 11 was questioned. Juror No. 11 told the court he did not make up his mind from the very first hour of deliberations; he did not fail to deliberate or keep an open mind; and, to the contrary, he was the first juror who turned the deliberations "into a discussion." He stated that at the outset of deliberations another juror said "my mind's made up, he's . . . guilty . . . as hell." In response, Juror No. 11 told him "no" and they needed to discuss this; he started with count 1 but the other jurors "were all over the place"; and they had a discussion but the other jurors "didn't like that [his] opinion was different." He said one of the jurors "got up and swore" at him; another juror was "badgering" him by asking him the "same things over and over" and "making statements to [him] over and over without having [him] saying anything"; he was trying to enter into a discussion but it was impossible; and he was "respecting everyone's opinions but they just didn't like [his] opinion."

After hearing counsel's arguments, with the prosecutor arguing to excuse Juror

8

No. 11 and defense counsel arguing in opposition, the court decided to excuse him. The court found that Juror Nos. 8, 7, 2, and 4 were more credible than Juror No. 11, and Juror No. 11 appeared "to be trying to hide something." The court reasoned that the four jurors essentially indicated that although Juror No. 11 might be listening and hearing, he "just does not seem to get involved in the process"; he entered into the deliberation process closed-minded and did not keep an open mind; and he had not made a good faith effort to deliberate.

B. *Analysis*

To protect a defendant's right to the individual votes of an unbiased jury, great caution is required when deciding to excuse a sitting juror. (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 71 (*People v. Allen*).) When reviewing a trial court's decision to discharge a juror, we do not reweigh the evidence; however, we apply a standard that requires a somewhat stronger showing than is typical for abuse of discretion review, and we engage in a more comprehensive and less deferential review than simply determining whether any substantial evidence supports the court's decision. (*Ibid*.) The basis for a juror's discharge must appear on the record as a demonstrable reality, and we evaluate whether the trial court's conclusion is manifestly supported by evidence on which the court actually relied. (*Ibid.*)

A trial court may dismiss a juror if it finds the juror is unable to perform his or her duties, including the duty to deliberate. (*People v. Cleveland* (2001) 25 Cal.4th 466, 474, 485.) "A refusal to deliberate consists of a juror's unwillingness to engage in the deliberative process; that is, he or she will not participate in discussions with fellow jurors by listening to their views and by expressing his or her own views. Examples of refusal to deliberate include, but are not limited to, *expressing a fixed conclusion at the beginning of*

9

*deliberations and refusing to consider other points of view*, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury." (*Id.* at p. 485, italics added.) However, the "circumstance that a juror does not deliberate well or relies upon faulty logic or analysis [or] . . . disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts . . . does not constitute a refusal to deliberate . . . . A juror who has participated in deliberations for a reasonable period of time may not be discharged for refusing to deliberate, simply because the juror expresses the belief that further discussion will not alter his or her views." (*Ibid.*)

Regarding the requirement that a juror keep an open mind, the courts recognize the "reality that a juror may hold an opinion at the outset of deliberations is . . . reflective of human nature. . . . We cannot reasonably expect a juror to enter deliberations as a *tabula rasa*, only allowed to form ideas as conversations continue. What we can, and do, require is that each juror maintain *an open mind, consider all the evidence, and subject any preliminary opinion to rational and collegial scrutiny before coming to a final determination.*" (*People v. Allen, supra*, 53 Cal.4th at p. 75, italics added.) Thus, a juror's mere failure to change his or her opinion does not show a failure to deliberate under circumstances where the juror was participating in the deliberative process. (See *id.* at pp. 74-75.)

When evaluating the court's ruling, we defer to its assessment that the four jurors credibly described Juror No. 11's conduct, and that Juror No. 11's description of what occurred was not credible. (*People v. Merriman* (2014) 60 Cal.4th 1, 101.) A trial " ' " 'judge who observes and speaks with a juror and hears that person's responses (noting,

10

among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record.' " ' " (*Ibid.*)

The four jurors indicated to the court that although Juror No. 11 was speaking and listening during the discussions, he had made up his mind from the outset of the deliberations and was not willing to consider other points of view. Juror No. 4 told the court that Juror No. 11 had a closed mind and his mind was made up from the beginning; it did not matter what other jurors were going to say; he told the other jurors he did not "believe in these scenarios"; he did not want to "infer or look at anything"; and he did not want to acknowledge that there was anything to talk about. Juror No. 8 told the court that Juror No. 11 had made his mind up before he entered the jury room; at the outset of their discussions he said he did not "see any of it" and it did not make sense; and he would provide no feedback during their discussions. Juror No. 7 told the court that Juror No. 11 had made his decision from the beginning; he had a closed mind; and when other jurors interjected comments he indicated he was just going to "shut down." Juror No. 2 told the court that Juror No. 11 had his opinion and a closed mind from the first hour of deliberations, and because of his strong opinion he was "shut down" during the discussions.

As described by these jurors, during the deliberations Juror No. 11 was at times listening and talking, but he was not engaging in an evaluation of other jurors' opinions and he at times withdrew from the deliberations because he did not want to consider the points raised by other jurors. Their descriptions reflect that he was not deliberating in a meaningful manner because he had already decided the case in his mind and he was not willing to give other jurors an opportunity to change his views. The jurors consistently stated that Juror No.

11

11 engaged in this intransigent approach from the beginning of the deliberations, which reflects this is not a situation where a juror has deliberated with an open mind for a reasonable period and is now simply communicating that he or she has made a final decision.

The record shows as a demonstrable reality that Juror No. 11 was not willing to engage in the deliberative process, which requires that he enter deliberations with an open mind and not become entrenched in any particular decision until he has in good faith considered the views expressed by the other jurors. Although Juror No. 11 clearly had the right to adhere to his position after good faith deliberations, the four jurors that the court interviewed showed that Juror No. 11 was adamantly maintaining his opinion without giving other jurors' opinions any consideration. This was in violation of his duty to consider other jurors' points of view before making a final decision. (*People v. Cleveland, supra*, 25 Cal.4th at p. 485; *People v. Allen, supra*, 53 Cal.4th at p. 75.)

We are not persuaded by defendant's claim that the jurors' statements that Juror No. 11 was not deliberating were conclusory and often made in response to leading questions, and any facts the jurors did provide showed Juror No. 11 was deliberating. Although the jurors were at times asked leading questions, they also spoke in a nonconclusory manner and provided details to explain how Juror No. 11 was not willing to engage in meaningful discussions (e.g., he shut down; he said he did not believe in these scenarios; he refused to acknowledge there was anything to talk about). Further, the record shows that although Juror No. 11 was talking and listening, he was not deliberating in a meaningful manner; that is, maintaining an open mind and taking the views of other jurors into account before reaching a final conclusion.

12

Based on the showing that Juror No. 11 was unwilling to engage in the deliberative process, the court did not err by discharging him.

**SECTION II REDACTED AND FILED UNDER SEAL**

III. *Evidentiary Rulings Concerning Expert Testimony*

Defendant asserts the trial court made two erroneous rulings regarding expert testimony proffered by the parties. He asserts the court erred by (1) allowing the prosecution to present expert testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS), and (2) precluding the defense from presenting an expert's opinion that defendant did not have an abnormality related to pedophilia.

A. *General Principles Governing Expert Testimony*

Expert opinion testimony is admissible if it is (1) "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact" and (2) "[b]ased on matter . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . . ." (Evid. Code, § 801.) The jury need not be wholly ignorant of the subject matter of the opinion to justify its admission; even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would assist the jury. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299-1300.) The opinion evidence is properly excluded when it would add nothing to the jury's common fund of information, i.e., when the subject of inquiry is of such common knowledge that a person of ordinary education could reach a conclusion as intelligently as the witness. (*Id.* at p. 1300.) A trial court's decision on the admission of expert testimony will not be disturbed on appeal unless " 'a manifest abuse of discretion is shown.' " (*Id.* at

13

p. 1299.)

## B.  *Admission of Expert Testimony on CSAAS*

CSAAS evidence refers to the common reactions of child molestation victims, including delayed reporting.  (*People v. McAlpin, supra*, 53 Cal.3d at p. 1300.)  CSAAS testimony is inadmissible to prove that a molestation has actually occurred, but it is admissible for the limited purpose of disabusing the jury of misconceptions it might hold about how a child reacts to a molestation.  (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744.)  The limited admission of CSAAS evidence gives "the jurors information they need[] to objectively evaluate the [child's] credibility" so as to provide for a fair trial.  (*People v. McAlpin*, at p. 1302.)  However, to ensure the jury will not use the expert evidence to improperly infer the abuse occurred, (1) the CSAAS evidence must be targeted to a specific myth or misconception suggested by the evidence, and (2) the jury should be instructed that the evidence may not be used to determine the truth of the molestation claim and is only admitted to show that the victim's reactions are not inconsistent with having been molested. (*People v. Bowker* (1988) 203 Cal.App.3d 385, 393-394; *People v. Housley* (1992) 6 Cal.App.4th 947, 956-957.)  It is the People's burden to identify the myth or misconception the evidence is designed to rebut, and where "there is no danger of jury confusion, there is simply no need for the expert testimony." (*People v. Bowker*, at p. 394.)

The record here shows compliance with these requirements.  The victims did not immediately report the molestation, with Jane Doe 1 waiting about six years and Jane Doe 2 waiting over one year after its occurrence.  In its pretrial motions the prosecution referred to the victims' delayed reporting as a basis for admission of the CSAAS testimony and stated

14

the testimony would be relevant for the jury to understand that this delay was not abnormal for a molested child. At trial, the prosecution's CSAAS expert qualified her testimony by stating she was not testifying about whether the complaining witnesses were or were not sexually abused; CSAAS was developed based on information showing that children react to trauma differently than adults; CSAAS assumes that abuse has occurred and that there is a relationship between the child and the abuser; and CSAAS is never used to diagnose whether abuse has occurred. When testifying regarding delayed reporting, the expert explained that in the past it was assumed that if a child had been molested "of course they would tell right away," but research has revealed this is often not the case. She stated that a child might not report the molestation because of overt threats or feelings that they need to protect someone or they have been bad and will get in trouble. Thus, children often wait to reveal the molestation until they feel in a safe environment such as when they are older, or something occurs that finally makes it necessary for them to speak out such as a threat to a sibling.

At the conclusion of the expert's testimony, as well as at the conclusion of all the evidence, the court instructed the jury on the limited purpose of the testimony, stating the jury must not consider the CSAAS evidence as proof that the alleged molestation was true and it should consider the evidence "only for the limited purpose of showing, if it does, that the alleged victim's reactions, as demonstrated by the evidence, are not inconsistent with her having been molested." (See CALJIC No. 10.64.)

Defendant asserts the court should have excluded the CSAAS evidence because the defense did not attack the victims' credibility based on delayed reporting; there was no

15

particularized showing that the jury in this case would unfairly evaluate the delayed reporting; and under these circumstances the evidence was more prejudicial than probative.

The contention is unavailing. Although in closing arguments defense counsel did not focus on delayed reporting as an issue, he did note that Jane Doe 1 did not tell anyone when she was first molested. In any event, CSAAS evidence may be admitted when a specific myth or misconception is suggested by the evidence, regardless of whether the defense refers to the matter to support its case. (*People v. Patino, supra*, 26 Cal.App.4th at p. 1745; see *People v. Riggs* (2008) 44 Cal.4th 248, 293 ["there is no requirement that the defendant explicitly challenge a witness's credibility on a basis that might be explained by [battered women syndrome] evidence before such evidence may be introduced"].) As explained in *Patino*, "Regardless of how or by whom [the victim's] delay in reporting the molests was introduced to the jury, an obvious question was raised in the minds of the jurors. *It would be natural for a jury to wonder why the molestation was not immediately reported if it had really occurred . . . .* If it were a requirement of admissibility for the defense to identify and focus on the paradoxical behavior, the defense would simply wait until closing argument before accentuating the jurors' misconceptions regarding the behavior. To eliminate the potential for such results, the prosecution should be permitted to introduce properly limited credibility evidence if the issue of a specific misconception is suggested by the evidence." (*Patino*, at p. 1745, italics added; accord *Riggs*, at p. 293 ["Even if the defendant never expressly contests the witness's credibility along these lines, there is nothing preventing the jury from ultimately finding in its deliberations that the witness was not credible, based on misconceptions that could have been dispelled" by battered woman syndrome evidence.].)

16

Here, the trial court could reasonably assess that the CSAAS evidence had significant relevance for the jury to evaluate the victims' credibility with an understanding of the psychological factors that can make molestation victims reluctant to tell anyone what has occurred. Further, there was nothing that required the court to exclude the evidence based on undue prejudice grounds. The expert explained the limited purpose of the expert's testimony concerning CSAAS; the jurors were repeatedly instructed on the limited purpose of the evidence; and we presume the jurors understood and followed this instruction. (See *People v. McCurdy* (2014) 59 Cal.4th 1063, 1096.)

We note this is *not* a case where the prosecution introduced the CSAAS evidence in its case-in-chief under circumstances reflecting that it was improperly introduced to support the truth of the molestation claim rather than to disabuse the jury of a common misconception. (See, e.g., *People v. Bowker, supra*, 203 Cal.App.3d at pp. 394-395.) The record here shows the CSAAS evidence was presented to the jury in a manner that was narrowly tailored to inform the jury that counterintuitive reactions, including delayed reporting, were not uncommon for child molestation victims.

C. *Exclusion of Defense Expert Testimony on Absence of Pedophilic Traits*

Defendant argues the trial court abused its discretion by excluding testimony from Richard Rappaport, a forensic psychiatrist who would have testified that his examination of defendant did not reveal any pedophilic deviancy.

1. *Proffered Defense Expert Testimony*

The trial court conducted an Evidence Code section 402 hearing during which Dr. Rappaport testified regarding his examination of defendant for pedophilia.

17

Dr. Rappaport has been a psychiatrist for 43 years and has testified as an expert in over 100 cases; however, his testimony concerning pedophilia has been less frequent (estimated at less than 10 cases). Dr. Rappaport testified a pedophile is a person who has difficulty relating sexually to adults, has sexual fantasies about children, tends to collect and look at materials involving children, and at times has sexual interactions with children.

Dr. Rappaport interviewed defendant for about four hours, and stated the personal interview is the most important part of his evaluation. However, he did not expect defendant to admit being a pedophile, so before the interview he reviewed defendant's records to see if there was anything indicative of pedophilia. The records included a letter from defense counsel providing some details about the case; the charging information; a questionnaire answered by defendant's wife about her relationship with defendant; police reports and other reports concerning witnesses; and the preliminary hearing transcript.

From his review of the records, Dr. Rappaport noted there were no indications of "suspicious" activities by defendant, such as living in an area where there were a lot of children around; working in "child organizations" such as Boy Scouts; being a "gym rat" where he would be "hanging around" children; collecting photographs of children or child pornography; or having previous allegations of child molestation. Also, defendant had been married more than once, had his own children, had a relationship with an adult woman outside of marriage, and presented as a person without any mental illness.

Dr. Rappaport stated that when conducting personal interviews he asks the person about their "childhood, their school, background, educational history and so forth, their occupation history, marital history, psychiatric history, social history, family background";

18

he conducts a mental status exam; and he talks in detail about the charged incident. Based on his interview with defendant, Dr. Rappaport opined that the "manner in which [defendant] speaks, the manner in which he gives his history, the evidence of what he's done in his life is all supportive of a person who doesn't have any history of [pedophilic] behavior." Dr. Rappaport concluded defendant does not have a "deviant personality"; does not have "any abnormality related to pedophilia"; and there is no evidence that he has an abnormal sexual interest in children.

On cross-examination, Dr. Rappaport testified that although a "classic pedophile" does not have adult sexual relationships, a pedophile can have sexual interests and relations with both adults and children. Also, Dr. Rappaport acknowledged he did not use any standardized tests to examine defendant, such as the "Minnesota Multiphasic Assessment," the "penile plethysmograph exam," the "Multiphasic Sex Inventory Test," the "Abel Assessment for Sexual Interest" exam, the "SORAG," or the Static 99. Dr. Rappaport stated that psychologists, not psychiatrists, generally administer standardized tests; the tests are based on self-reporting; in his view most of them are "too subjective" and "not definitive enough"; and examiners can accentuate the elements that support their particular view. Dr. Rappaport acknowledged he was not familiar with the penile plethysmograph or the Abel Assessment tests. He stated that psychiatrists engage in a "classic psychological evaluation" which is generally accepted in the community; they "become experts in evaluating people"; and forensic psychiatrists "also try to evaluate the veracity of people, keeping in mind that there is often . . . great incentive for lying. . . . We use our experience and judgment. And people try to fool us at times and we have to be able to detect that."

19

## 2. *Court's Ruling*

After the presentation of Dr. Rappaport's testimony, the prosecutor told the court she had some concerns about the witness because despite his long tenure in the field, he did not know about some of the tests that are used to assess pedophilia and he did not administer any tests. The prosecutor noted that in the California Supreme Court case (*People v. Stoll* (1989) 49 Cal.3d 1136) allowing the admission of expert opinion on the absence of pedophilic traits, the expert had conducted an interview and administered tests. Also citing *Stoll*, defense counsel responded that Dr. Rappaport was entitled to base his opinion on an interview; he could be cross-examined concerning the material he relied on; and it was up to the jury to determine the materiality of the information.

The trial court ruled Dr. Rappaport could not provide the jury with his opinion that defendant did not have the traits of a child molester. The court stated under *Stoll*, experts may opine on this matter if they go through "some extensive interviews and some recognized or standardized psychological, personality tests." However, there had to be something more than a four-hour interview with the expert relying on what the defendant was telling him; it was "suspect" that the expert could determine truthfulness from an interview; there was no indication how the reports reviewed by the expert could reveal whether defendant had pedophilic personality traits; and the expert's evaluation was not "accurate, thorough and comprehensive" and did not include the use of tests that are recognized by the courts. The court further stated the expert's opinion that defendant did not exhibit pedophilic traits was more prejudicial than probative because it was based on a "minimal foundation" given the

20

"lack of an extensive study of the defendant," and it would usurp the jury's role in deciding whether defendant committed the crime.

### 3. *Analysis*

In *People v. Stoll, supra*, 49 Cal.3d 1136, the court held that an expert's opinion that a defendant did not show signs of sexual deviancy was admissible character evidence and the evidence did not need to be subjected to the "*Kelly/Frye*" standards because it did not involve a new, unproven scientific technique that might mislead the jury. (*Id*. at pp. 1140-1141, 1152-1157.) The expert in *Stoll* made his sexual deviancy assessment based on "an interview and professional interpretation of standardized written personality tests." (*Id*. at p. 1140.) The court noted that the evidence must still satisfy the traditional limits governing expert testimony, including that the evidence be sufficiently beyond common experience to be of assistance to the jury and that the expert rely "upon professionally reasonable 'matter.' " (*Id*. at pp. 1140, 1154.) The court reasoned the expert's opinion that the defendant showed no signs of sexual deviancy was relevant to the issue of whether he committed the crime; the opinion testimony would assist the jury because it "could not otherwise have been aware of personality traits inconsistent with such misconduct"; and the jury was free to decide what weight, if any, to afford the opinion. (*Id.* at pp. 1153-1154.) Regarding the requirement that the expert rely on professionally reasonable material, the court reasoned the courts defer to an expert's decision to rely on standardized psychological tests; the expert's testimony indicated professionals routinely use material from these tests to draw behavioral conclusions; the expert was also entitled to base his opinion on a psychological interview; the expert could be cross-examined at trial concerning the material underlying his opinion;

21

and the jury could reject his conclusions if it had doubts as to the underlying material. (*Id.* at pp. 1154-1155, 1158.)

Unlike the circumstances in *Stoll*, Dr. Rappaport did not rely on both standardized tests and a personal interview when forming his opinion, but only on the latter. Although standardized testing may not be essential to establish an adequate foundation for an expert opinion on a defendant's lack of pedophilic characteristics in all cases, the court could reasonably conclude that Dr. Rappaport's record review and personal examination in this case was insufficient to satisfy the required foundational showing that the expert relied on professionally reasonable material.

Before allowing an expert's opinion to be presented to the jury, a trial court has an obligation to require a showing of an adequate foundation for the opinion. (*Korsak v. Atlas Hotels, Inc*. (1992) 2 Cal.App.4th 1516, 1523.) Trial courts have a "substantial 'gatekeeping' responsibility" concerning expert testimony, including to determine whether the matter relied upon by the expert is "of a type on which an expert may reasonably rely." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 769-770, (*Sargon*) italics omitted; see *People v. Lucas* (2014) 60 Cal.4th 153, 227; *People v. Ramos* (1997) 15 Cal.4th 1133, 1175.) When making this determination, the court may "inquire into, not only the type of material on which an expert relies, but also whether that material actually supports the expert's reasoning. 'A court may conclude that there is simply too great an analytical gap between the data and the opinion offered.' " (*Sargon*, at p. 771.) Further, the "required foundational showing that the opinion rests on matters of a type experts

22

reasonably rely on is not made where . . . the expert does not disclose what he relied on in forming his opinion."  (*Kelley v. Trunk* (1998) 66 Cal.App.4th 519, 524.)

However, courts must be cautious in excluding expert testimony, and must confine their gatekeeping role to a preliminary determination whether the matter relied on can provide a reasonable basis for the opinion or whether it is clearly invalid and unreliable. (*Sargon, supra*, 55 Cal.4th at p. 772 ["the gatekeeper's role 'is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field' "].)  If there is a threshold showing of reliability, questions concerning the soundness of the material underlying the opinion is a matter of weight for the jury, not admissibility.  (See *People v. Stoll, supra*, 49 Cal.3d at p. 1158; *People v. Sundlee* (1977) 70 Cal.App.3d 477, 484-485.)  On appeal, we review the trial court's determination of threshold reliability for abuse of discretion.  (*Sargon, supra*, at p. 773; *People v. Ramos, supra*, 15 Cal.4th at p. 1175.)

Here, Dr. Rappaport briefly referred to several characteristics that were indicative of pedophilia (i.e., difficulty relating sexually to adults, having sexual fantasies about children, collecting materials involving children, sexual interactions with children), and then explained that there were no "suspicious" matters depicted in the records that he reviewed concerning defendant's case.  The trial court could reasonably assess that unlike the more comprehensive evaluation that would be reflected when standardized tests are used in conjunction with a personal interview (see *People v. Stoll, supra*, 49 Cal.3d at pp. 1148-1149), Dr. Rappaport relied on only scant criteria to evaluate sexual deviancy based on a small number of

23

pedophilic criteria. Further, the court could assess that the records he reviewed—which concerned primarily the current allegations with no indications that they contained a comprehensive investigation of defendant's personal history—were not shown to provide sufficient information to make a reasonable assessment regarding the absence of pedophilic traits. (See *People v. Ramos, supra*, 15 Cal.4th at p. 1175 [court could reasonably find expert did not have "adequate basis for formulating a relevant expert opinion notwithstanding his general qualifications"].)

Likewise, although Dr. Rappaport described the general categories of information that he discusses during a personal interview, he provided scant information about what factors he relied on from the personal interview with defendant to determine defendant did not exhibit pedophilic traits. He broadly referred to the "evidence of what [defendant has] done in his life," but provided no details or explanation of how this related to a pedophilia-trait assessment. He also cited "the manner" in which defendant spoke and gave his history, but again failed to correlate this with the issue of pedophilia. When explaining his reliance on the personal interview, Dr. Rappaport emphasized that his lengthy experience as a forensic psychiatrist made him skilled at making credibility assessments. Although this may well be true, it is well established that credibility determinations are for the trier of fact and generally are not a proper subject of expert testimony. (*People v. Wells* (2004) 118 Cal.App.4th 179, 189.) The trial court could properly determine that Dr. Rappaport's conclusions derived from mere credibility assessments during the personal interview did not fall with the realm of expert opinion that would assist the jurors in a matter beyond their common experience.

24

The record supports findings that Dr. Rappaport's opinion concerning defendant's lack of pedophilic abnormality had only minimal foundational support and was partially premised on an assessment of credibility that would not assist the jury. Accordingly, the court did not abuse its discretion by excluding the opinion testimony because it lacked a threshold reliability showing, and, for the same reasons, it was more prejudicial than probative. Likewise, the exclusion of the evidence did not violate defendant's right to a fair trial. (*People v. Ramos, supra*, 15 Cal.4th at pp. 1175-1176 [no federal constitutional violation when expert evidence excluded because it fails to meet foundational requirements].)

**SECTION IV REDACTED AND FILED UNDER SEAL**

DISPOSITION

The judgment is affirmed.

HALLER, J.

WE CONCUR:

McCONNELL, P. J.

McINTYRE, J.

25